674 A.2d 655

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Steven A. BESCH, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 6, 1994.
Reargued Jan. 22, 1996.
Decided April 17, 1996.

Reargument Denied June 5, 1996.

Michael S. Gingerich, Lewistown, for Besch.

Mary Benefield Seiverling, Harrisburg, Robert A. Graci, Harrisburg, Anthony Sarcione, Westchester, for Com.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

This case presents the Court with the question of whether the prosecution of a wholly illegitimate drug conspiracy which exhibits no legitimate purpose nor encompasses any elements

of a legitimate business activity is within the scope of the Pennsylvania Corrupt Organizations Statute. 18 Pa.C.S. § 911 et seq. (hereinafter referred to as "Pa.C.O.A."). For the reasons that follow, this Court finds that the Pa.C.O.A. statute does not encompass the prosecution of a wholly illegitimate enterprise, thus, we affirm the Superior Court decision in part, and reverse in part.[1]

The instant action arose from an investigation by the Sixth Statewide Grand Jury into the drug trafficking operation of the Appellant in and around the Mifflin County area of Pennsylvania. The investigation commenced in 1987 and culminated on October 12, 1989 with the arrest of Appellant and the search of his home. During the search, police seized 16 one-half gram packets and four "eight ball" packets of cocaine with a street value of $2,360.00, cash totalling $1,332.00, scales, baggies, triangular packets commonly used for packaging drugs, 50 doses of LSD, marijuana residue, a roach clip and large sun lamps commonly used in drying marijuana leaves.

Based upon the information accumulated during the investigation and the items seized in the search, Appellant was charged with nine specific violations of the criminal code which included one count of violating Pa.C.O.A. and one count of conspiring to violate Pa.C.O.A., one count of conspiring to deliver a controlled substance, four counts of delivery of controlled substances, possession with intent to deliver a controlled substance and possession of a controlled substance.[2] After a jury trial Appellant was convicted on all counts. The trial court sentenced Appellant to a cumulative term of imprisonment of 8 to 33 years and fines totalling $85,000. The Superior Court affirmed the convictions but reversed in part the judgment of sentence for a determination of Appellant's

---

1. The standard of review of this Court in criminal appeals was aptly stated in *Commonwealth v. Boone,* 467 Pa. 168, 173, 354 A.2d 898, 900 (1976): "Our responsibility upon review is to determine whether the record supports the factual findings of the lower court and the legitimacy of the inferences and legal conclusions drawn therefrom."

2. *See* 18 Pa.C.S. § 911(b)(3) and (b)(4); 18 Pa.C.S. § 903; 35 P.S. § 780–113(a)(30); and (a)(16).

4

ability to pay the fines imposed. This Court granted allowance of appeal.

During the course of the trial, the Commonwealth presented a significant number of witnesses, many of whom were members of the drug trafficking network which operated from Appellant's home. This testimony revealed a clearly defined operation wherein Appellant, and his primary conspirator, Douglas Woodward, had by specific agreement developed a business of distributing marijuana and cocaine. Woodward testified that he originally met Appellant in 1985 through a mutual acquaintance, Wayne Yohn, in order to purchase marijuana from Appellant. Yohn had previously supplied marijuana to Woodward, but as he had none available at the time, he referred Woodward to Appellant.

Shortly after their initial meeting Appellant and Woodward decided to go into business together. Each man put up an equal amount of cash and purchased one-half pound of marijuana which they divided into smaller packets for resale. Each man made $300 profit from this initial investment which they used to continue the operation. According to Woodward, they had a series of regular customers, which included Wayne Yohn, Jeff Herbster and Charlie Miller. As business continued Woodward and Appellant decided to add cocaine to their inventory in order to increase their profits. They also had a regular chain of suppliers which included Anthony Dalton, Ken Norton, and Jeff Holland. Woodward also testified that the cocaine they bought was sold to their suppliers from one Garth Honsaker of Altoona.[3]

Woodward testified that Appellant handled all the money transactions and that it was Woodward's job to cut and package all the marijuana and cocaine for resale. All sales took place from Appellant's home, where Woodward used the extra bedroom for storage and packaging of controlled sub-

3. Although no objection to this testimony was raised we note that all references to Garth Honsaker of Altoona as the ultimate source of the cocaine sold by Appellant and Woodward is hearsay. None of the witnesses who testified at this trial had any direct knowledge of sales of cocaine between either Appellant and Mr. Honsaker or between Appellant's regular suppliers and Mr. Honsaker.

stances (or merchandise). Woodward testified that he was a drug user but that Appellant was not. Woodward also testified that he usually took a portion of his profits in cocaine or marijuana. Business went on smoothly for Appellant and Woodward until the arrest of a regular customer, Charlie Miller in 1989.

Miller was introduced to Appellant by Jeff Herbster in order to purchase cocaine. Miller had a criminal record and often was short of funds for drug purchases. Miller, knowing that Appellant collected guns, offered to exchange guns for drugs. Appellant agreed to the exchange and Miller subsequently burglarized a residence of one of Miller's own relatives and traded several of the stolen handguns with Appellant in exchange for cocaine. Miller was later arrested for the burglary and entered into an agreement with the prosecutor for a reduced penalty on the burglary and gun charges in exchange for his testimony against Appellant.

Following Miller's arrest several of Appellant's other "associates" were arrested and eventually testified against Appellant. In addition to the testimony of Woodward and Miller as described above, the following people offered testimony regarding their association with Appellant.

Ken Norton testified that Woodward introduced him to the Appellant. Norton was a regular supplier of cocaine to Appellant; all sales took place in Appellant's home. Norton made deliveries to Appellant at least once a week. Norton's profit from the enterprise was a portion of the cocaine for his personal use.

Dennis Moore testified that he was acquainted with Appellant as they were both gun collectors. Moore testified that he had occasionally sold guns to Appellant and that he regularly purchased cocaine from Appellant in Appellant's home.

Daniel Wagner testified that he was a regular customer of Wayne Yohn and Jeff Herbster and that those two men introduced him to Appellant. Yohn and Herbster told Wagner that if they did not have cocaine when he needed it he could

buy it from Appellant. Wagner only purchased cocaine from Appellant on one occasion.

Roy Marks testified that he was a regular customer of Miller and/or Yohn and on one occasion when neither of his regular suppliers had anything available they sent him to Appellant and he purchased marijuana. Marks also testified that he was in Appellant's residence on one occasion when Yohn brought cocaine into the house. Marks observed Yohn put the cocaine in the basement unbeknownst to Appellant.

One of the most informative witnesses against Appellant was Dennis Knepp. Knepp was a regular cocaine user who had been arrested in 1986 for selling drugs for the notorious Honsaker. As a result of the 1986 arrest he entered into a plea agreement in federal court, agreeing to serve as an informant in exchange for probation.[4] Knepp normally purchased his cocaine from Yohn. On one occasion when Yohn was unable to supply Knepp he introduced Knepp to Appellant. Knepp thereafter made all his drug purchases from Appellant. Knepp testified that he was in Appellant's home and observed Yohn, Herbster, Moore and Zannino all buying drugs from the Appellant. Knepp also testified that Appellant referred to the above named individuals as "his group" and bragged that they never "talked on" each other.

Michael Majestic testified that he was a regular user who contacted Louis Zannino for the purposes of purchasing cocaine. Zannino introduced Majestic to Appellant and Majestic, on at least one occasion, purchased cocaine from Appellant. Majestic also testified that at one time when he was in Appellant's home he observed Herbster give a large amount of cash to Appellant so that Appellant could purchase cocaine for Herbster.

Based on all the testimony as delineated above the Commonwealth argues that a drug enterprise existed which included Appellant, Knepp, Miller, Zannino, Herbster, Yohn,

---

4. Knepp was the only person to testify to actual contact with Honsaker. However, that relationship ended with Knepp's 1986 arrest. Knepp had no evidence to connect Honsaker with Appellant other than the hearsay of other persons allegedly involved in the instant conspiracy.

Woodward, Honsaker, Norton, and Holland. The enterprise functioned with Appellant's home as the central location for buying, packaging for resale and then selling of cocaine and marijuana. Norton and Holland were regular suppliers to Appellant, who allegedly received their drugs from Honsaker. Knepp, Miller, Herbster, Yohn and Zannino were regular customers who often brought new customers into the network. Woodward was Appellant's primary partner in trade. The entire enterprise existed for the purpose of buying and selling illegal drugs. Although Appellant did run an automobile repair shop out of his garage at the same location, there was no testimony offered that proceeds from the drug enterprise were invested into the car repair business. In fact, one witness testified that he believed that car repair was a hobby of Appellant, not an income producing business.

As previously stated herein Appellant's participation in the above recited activities lead to his conviction on four counts of delivery of a controlled substance, one count of possession of a controlled substance, one count of conspiracy to delivery controlled substances and two violations of the Pa.C.O.A. statute.[5] Specifically at issue in this case are the two Pa.C.O.A. violations of 18 Pa.C.S. § 911(b)(3) and (b)(4):

(3) It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

(4) It shall be unlawful for any person to conspire to violate any of the provisions of paragraph (1), (2) or (3) of this subsection.

Taking all of the evidence in the light most favorable to the Commonwealth, it is clear that an "enterprise" existed and flourished in Appellant's home centering around the business of buying and selling controlled substances for profit. It is clear that Appellant was a member of the "enterprise" and agreed to participate in all of the activities of that enterprise along with his fellow associates. It was also clearly estab-

5. See n. 2 infra.

lished that the Appellant along with various members of the "enterprise" engaged in a "pattern of racketeering" activities, as that term is defined within Pa.C.O.A. at § 911(h)(4), such as individual acts of possession and/or sales of controlled substances, burglary and receiving stolen property. Thus, the only question to be addressed is whether this "enterprise" comes within the scope of the Pa.C.O.A.

In arguing that this particular "enterprise" violates Pa. C.O.A., the Commonwealth focuses upon the definition within the statute of the word "enterprise."

**"Enterprise"** means any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce.

18 Pa.C.S. § 911(h)(3). The Commonwealth asserts that since the definition given does not restrict itself to "legitimate enterprises" then the statute can clearly extend to a prosecution for wholly illegitimate "enterprises." In other words, what is not prohibited must be permitted. However, by focusing on the definition of the word "enterprise" without reference to the entire piece of legislation, the Commonwealth distorts the intent of the General Assembly in enacting Pa. C.O.A., and violates the primary principles of statutory construction. The very first, and the primary rule of statutory construction states:

[1 Pa.C.S.] § 1921. **Legislative intent controls**

(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.

(b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

The intention of the General Assembly is clearly and specifically spelled out at great length in the Pa.C.O.A. statute.

## § 911. Corrupt organizations

(a) **Findings of fact.**—The General Assembly finds that:

(1) organized crime is a highly sophisticated, diversified, and widespread phenomenon which annually drains billions of dollars from the national economy by various patterns of unlawful conduct including the illegal use of force, fraud, and corruption;

(2) organized crime exists on a large scale within the Commonwealth of Pennsylvania, engaging in the same patterns of unlawful conduct which characterizes its activities nationally.

(3) the vast amounts of money and power accumulated by organized crime are increasingly used to infiltrate and corrupt legitimate businesses operating within the Commonwealth, together with all of the techniques of violence, intimidation, and other forms of unlawful conduct through which such money and power are derived;

(4) in furtherance of such infiltration and corruption, organized crime utilizes and applies to its unlawful purposes laws of the Commonwealth of Pennsylvania conferring and relating to the privilege of engaging in various types of business and designed to insure that such businesses are conducted in furtherance of the public interest and the general economic welfare of the Commonwealth;

(5) such infiltration and corruption provide an outlet for illegally obtained capital, harm innocent investors, entrepreneurs, merchants and consumers, interfere with free competition, and thereby constitute a substantial danger to the economic and general welfare of the Commonwealth of Pennsylvania.

18 Pa.C.S. § 911(a). [emphasis added].

■ There is no escaping the clear intent of this statute. The General Assembly went to great pains to set forth the parameters of this piece of legislation. Pa.C.O.A. is directed at preventing the infiltration of legitimate business by organized crime in order to promote and protect legitimate economic development within Pennsylvania. Although the Commonwealth acknowledges this to be the precise intent of the General Assembly in enacting Pa.C.O.A., they choose to ignore same. However, once the intent of the General Assembly has been ascertained that intent cannot be ignored, rather, it must be given effect. *Hatfield v. Continental Imports, Inc.,* 530 Pa. 551, 610 A.2d 446 (1992); *Frontini v. Commonwealth, Department of Transportation,* 527 Pa. 448, 593 A.2d 410 (1991); 1 Pa.C.S. § 1921(a).

Without reference to the intent of this legislation the specific subsections that Appellant has been convicted under are difficult to comprehend.[6] Following the Commonwealth's argument, what Pa.C.O.A. thus prohibits is any group of criminals from forming an association and engaging in any of the enumerated criminal acts at § 911(h)(1)(i) of the statute, without any connection between the association of criminals, the type of crimes they engage in, and any legitimate Commonwealth business. We find it incomprehensible that the General Assembly would go to such great lengths to explicate that

6. As stated above the specific charges at issue in this case are the Pa.C.O.A. violations under 18 Pa.C.S. § 911(b)(3) and (b)(4):

(3) It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

(4) It shall be unlawful for any person to conspire to violate any of the provisions of paragraph (1), (2) or (3) of this subsection.

Pa.C.O.A. is designed to deter criminal enterprises from infiltrating legitimate business, yet not require that there be a link between the criminal enterprise, the crimes committed, and an infiltration of, or attempt to infiltrate, a legitimate business enterprise within the Commonwealth of Pennsylvania. Pa. C.O.A. only makes sense when the words of the statute are given their fair meaning in the context of the general purpose and intent of the statute. *Busy Beaver Building Centers, Inc. v. Tueche*, 295 Pa.Super.Ct. 504, 442 A.2d 252 (1981) (The language of a statute must be read in a sense which harmonizes with the subject matter and its general purpose and object).

In *Commonwealth v. Bobitski*, 534 Pa. 310, 632 A.2d 1294 (1993), this Court condemned a similar attempt by the Commonwealth to extend the reach of Pa.C.O.A. In that case, the defendant was an employee of a legitimate business, Thrift Drug, who used his position within the legitimate enterprise for personal gain through a pattern of illegal acts. There the Commonwealth urged this Court to endorse the position that "the organized systematic method by which the defendant committed his crimes brings him within the purview of the statute." *Id.* at 313, 632 A.2d at 1296. In that case we rejected the Commonwealth's position, finding that their reading of Pa.C.O.A., which lifted chosen words out of context, violated the express intent of the General Assembly in enacting Pa.C.O.A.

In construing the intent of this statute we need not look beyond its actual words. The express intent was to prevent infiltration of legitimate businesses by organized crime. The corrupt organizations statute is a penal statute and must be strictly construed. *Commonwealth v. Heinbaugh*, 467 Pa. 1, 354 A.2d 244 (1976); 1 Pa.C.S. § 1928(b)(1). Thus, when the Commonwealth argues that "appellee's conduct is exactly the sort of organized systematic conduct the statute appears to have targeted," they are utilizing the word organized in a manner not intended by the General Assembly. . . . The statute at issue was enacted to punish

persons engaged in organized crime, not "organized" criminals.

*Id.* at 314–15, 632 A.2d at 1296–97.[7]

The arguments of the Commonwealth in the case at bar are just as disingenuous as the argument this Court rejected in *Bobitski.* Just as we declared in *Bobitski* that not all "organized" criminals fall within the scope of Pa.C.O.A., we similarly find that not all criminal "enterprises" are within the purview of Pa.C.O.A. The prohibited activity under this statute is the infiltration of legitimate business by a pattern of illegal acts. Pa.C.O.A. is not a tool by which the Commonwealth may attack any and every group of criminals who by chance happen to conduct their criminal activities in such a fashion that one or more of their offenses happens to fall within the list of crimes enumerated in Pa.C.O.A.

The Commonwealth in urging this Court to accept their position asserts a strong public policy argument. The policy argument is that by targeting wholly illegitimate operations, such as the one at bar, the Commonwealth can cut off racketeering activity at its source. The Commonwealth reasons that the sale and distribution of illegal narcotics is a common method of producing revenue for organized crime, and that the illegally obtained revenue is then commonly used by organized crime to infiltrate legitimate business. Therefore, all illegal drug operations are organized racketeering operations awaiting the opportunity to infiltrate legitimate business and thus, a logical target of Pa.C.O.A.

7. We note that the Commonwealth in its brief in this case asserts that the standard of strict construction of penal statutes found at 1 Pa.C.S. § 1928(b)(1), and followed by this Court in *Bobitski,* has been overruled by the General Assembly. The Commonwealth asserts that § 1928(b)(1) was supplanted with what they argue is a less stringent standard of reading penal statutes found at 18 Pa.C.S. § 105, which states "The provisions of this title shall be construed according to the fair import of their terms...." *See* Appellee's brief at p. 25. The Commonwealth is incorrect. The provision at 18 Pa.C.S. § 105 does not supplant the rules of strict statutory construction in 1 Pa.C.S. § 1928(b)(1), nor are the sections in conflict. All statutes are to be read so as to accord fair import of their terms, and in so reading them, certain statutes, namely penal statutes, which effect life and liberty, are to be strictly construed. *Commonwealth v. Glover,* 397 Pa. 543, 156 A.2d 114 (1960).

This policy argument has some validity and it is quite attractive in a society vexed with constantly rising crime statistics. However, the Commonwealth's position when carried through to its logical end creates a Pa.C.O.A. statute that resembles the mythical hydra, consuming in its wake any and every conceivable criminal organization that the Commonwealth may choose to target, a concededly desirable end, but nonetheless an ill chosen means.[8] Allowing Pa.C.O.A. to be used as a tool in furthering this policy position rather than restricting the reach of the statute to its intended targets violates the intended goal of the General Assembly in drafting Pa.C.O.A. A review of the facts in the instant case illustrates how far from the intended purpose of Pa.C.O.A. the Commonwealth has drifted.

In the case at bar the police began investigating Appellant and his "enterprise" in 1987. The investigation continued until Appellant's arrest in 1989. Nothing came to light during the entire investigation which would indicate an intention on the part of any individual within this particular "enterprise" to use their revenue from the drug sales to infiltrate any business within Pennsylvania. In fact all of Appellant's co-conspirators within the "enterprise" testified that they were drug users and each made their transactions within the ongoing distribution ring in order to get sufficient drugs to satisfy their own personal use. Thus, taking all of the evidence in the

8. We note that this specific argument was adopted by the Superior Court in *Commonwealth v. Yacoubian*, 339 Pa.Super. 413, 489 A.2d 228 (1985). In *Yacoubian* the Superior Court, relying heavily upon the decision of the United States Supreme Court in *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), wherein this public policy argument was accepted by the majority of the United States Supreme Court, held that the Pennsylvania racketeering act could be read broadly enough to encompass illegitimate as well as legitimate "enterprises." In choosing to follow the lead of the United States Supreme Court in *Turkette*, the Superior Court rejected Yacoubian's argument that the Pennsylvania statute was distinguishable due to its lengthy and specific preamble which clearly delineates the intended scope of the legislation. We find that the Court in *Yacoubian* erred in following *Turkette* and ignoring the specific language and purpose of the Pennsylvania statute. Accordingly, we find that the decision of the Superior court in *Yacoubian* was erroneous to the extent that it is inconsistent with our decision herein.

14

light most favorable to the Commonwealth, it has proven beyond a reasonable doubt that an organization existed for the purpose of buying and selling illegal drugs and that the Appellant was a member of the organization and that he engaged in a pattern of activity which included acts that are enumerated offenses under Pa.C.O.A. However, there is not one piece of evidence that connects this drug enterprise even remotely to a legitimate business, or any attempt to infiltrate a legitimate business.[9]

To allow this conviction to stand in the absence of any proof connecting the criminal acts involved to the racketeering activity sought to be prohibited, regardless of the validity of the motive, would be a true distortion of Pa.C.O.A. Accordingly, Appellant's convictions under Pa.C.O.A. at 18 Pa.C.S. § 911(b)(3) and (b)(4) are reversed, and the sentences imposed at those counts are vacated.[10] The decision of the Superior court is thereby reversed in part, as set forth specifically herein, and affirmed in all other respects.

NIX, C.J., files a dissenting opinion which is joined by CASTILLE and NEWMAN, JJ.

NIX, Chief Justice, dissenting.

I believe that the Pennsylvania Corrupt Organizations Act (hereinafter "the Act"), encompasses illegitimate as well as

9. We do not mean to downplay the seriousness of the criminal conduct engaged in by Appellant and his co-conspirators. However, the crimes code adequately provides penalties for each of the acts described above, and we note that the Appellant was sentenced for each and every one of the drug and conspiracy charges brought by the Commonwealth. See, n. 2 infra.

10. Appellant had raised a second issue regarding his dual conspiracy convictions for conspiracy to violate Pa.C.O.A. at 18 Pa.C.S. § 911(b)(4) and criminal conspiracy at 18 Pa.C.S. § 903. The specific issue was whether the Double Jeopardy provisions of the Pennsylvania and United States Constitutions, and/or the statutory prohibition of 18 Pa.C.S. § 906 against multiple punishments for inchoate offenses, bar the imposition of sentences for convictions of both criminal conspiracy and conspiracy to violate Pa.C.O.A., where there is an identity of participants and activities in each conspiracy. As we find that the conviction for conspiracy to violate Pa.C.O.A. must be reversed we do not reach this issue.

legitimate business enterprises. Accordingly, I respectfully dissent.

The Act defines a business enterprise as "any . . . group of individuals associated in fact although not a legal entity. . . ." 18 Pa.C.S. § 911(h)(3). The plain language of this statute would include both legitimate and illegitimate business enterprises. This was the conclusion of the United States Supreme Court in *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). In *Turkette,* the Supreme Court considered the identical definition of "enterprise" found in the federal Racketeer Influenced and Corrupt Organizations statute at 18 U.S.C.S. § 1961(4)[1] and concluded:

> RICO is equally applicable to a criminal enterprise that has no legitimate dimension or has yet to acquire one. Accepting that the primary purpose of RICO is to cope with the infiltration of legitimate businesses, applying the statute in accordance with its terms, so as to reach criminal enterprises, would seek to deal with the problem at its very source.

*Turkette,* 452 U.S. at 591, 101 S.Ct. at 2532.

*Turkette* is but the capstone of a long line of federal cases which holds that the definition of "enterprise" in the federal statute includes illegitimate as well as legitimate enterprises.[2]

---

**1.** *Compare* 18 U.S.C. § 1961(4) (" 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity") *with* 18 Pa.C.S. § 911(h)(3) (" 'enterprise' means any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity engaged in commerce.")

**2.** *See, e.g., Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *United States v. Errico,* 635 F.2d 152, 155 (2d Cir.1980); *United States v. Provenzano,* 620 F.2d 985 (3d Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980); *United States v. Whitehead,* 618 F.2d 523, 525 n. 1 (4th Cir.1980); *United States v. Aleman,* 609 F.2d 298, 304–05 (7th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Rone,* 598 F.2d 564, 568–69 (9th Cir.), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Swiderski,* 593 F.2d 1246, 1248–49 (1978), *cert. denied,* 441 U.S. 933, 99 S.Ct. 2056, 60 L.Ed.2d 662 (1979); *United States v. Elliott,* 571 F.2d 880, 896–98 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).

16

The majority fails to discuss this highly persuasive case law. I recognize that this well-established line of federal cases is not binding on us in interpreting our own state statute. However, in failing to follow these cases, the majority removes this Commonwealth from the mainstream of Racketeer Influenced and Corrupt Organizations jurisprudence and inexplicably posits us on the fringe of this area of the law.

The majority's sole rationale for disregarding the plain language of the Act as well as the overwhelming weight of federal case law interpreting an identical provision in the federal statute is a single sentence in the preamble to the Act. Finding number (3) in the preamble to the Act states that "vast amounts of money and power accumulated by organized crime are increasingly used to infiltrate and corrupt legitimate businesses operating within the Commonwealth...." 18 Pa. C.S. § 911(a)(3). The majority holds that this language evidences the intent of the General Assembly to limit the reach of the Act to legitimate business enterprises. I disagree.

In *Turkette,* the United States Supreme Court considered the preamble to the federal Racketeer Influenced and Corrupt Organizations statute, which is substantially similar to the preamble found in the Act, and rejected a claim that applying the federal statute to legitimate businesses was contrary to the legislative history. The Court concluded:

Considering this statement of the Act's broad purposes, the [narrow] construction of RICO suggested by respondent and the court below is unacceptable. Whole areas of organized criminal activity would be placed beyond the substantive reach of the enactment. For example, associations of persons engaged solely in "loan sharking, the theft of and fencing of property, the importation and distribution of narcotics and other dangerous drugs" [84 Stat. 922–23] would be immune from prosecution under RICO so long as the association did not deviate from the criminal path. Yet these are among the very crimes that Congress specifically found to be typical of the crimes committed by persons

involved in organized crime ... and as a major source of revenue and power for such organizations.

*Turkette,* 452 U.S. at 589, 101 S.Ct. at 2531.

I agree with the reasoning of the United States Supreme Court. The majority, in footnote 8 of its opinion, suggests that the Act can be distinguished from the federal statute because our statute has a "lengthy and specific preamble which clearly delineates the intended scope of the legislation." Majority Opinion at 13 n. 8. However, the preambles to both statutes are substantially the same. This similarity reflects the fact that the Act "is based upon Chapter 96 of Title 18 of the United States Code, 18 U.S.C. §§ 1961–1968, entitled Racketeer Influenced and Corrupt Organizations (RICO)." *Commonwealth v. Yacoubian,* 339 Pa.Super. 413, 419, 489 A.2d 228, 231 (1985). A closer examination of the two statutes reveals that four of the five findings of fact in the preamble to the Pennsylvania statute were taken almost *verbatim* from the federal statute, including finding (3) so heavily relied upon by the majority.[3] Thus, our statute simply does not contain

---

3. *Compare* Organized Crime Control Act, Pub.L. No. 91–452, § 1, 84 stat. 922, 922–23, *cited in Turkette,* 452 U.S. at 588–589, 101 S.Ct. at 2531:

The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic process; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful ·activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.

additional language outlining a more specific purpose as erroneously suggested by the majority. Accordingly, I would defer to the interpretation of the United States Supreme Court on this point and avoid rewriting this area of the law so that it is unique to Pennsylvania. In ignoring the reasoning of the federal courts, the majority isolates Pennsylvania from the mainstream of Racketeer Influenced and Corrupt Organizations jurisprudence and inexplicably makes it more difficult for our state law enforcement authorities to combat organized crime encompassing a wide range of nefarious activities.

In fact, just one year ago, a plurality of this Court stated in *Commonwealth v. Wetton,* 537 Pa. 100, 641 A.2d 574 (1994): "[W]e find that neither the preamble nor the express language of the statute prevents its proscription from reaching enterprises organized and existing for illegal purposes." *Id.* at 112 n. 5, 641 A.2d at 579 n. 5. (Opinion in Support of Reversal of Zappala, J., joined by Flaherty and Cappy, JJ.) (citing *Commonwealth v. Yacoubian,* 339 Pa.Super. 413, 489 A.2d 228, 231

*with* 18 Pa.C.S.A. § 911(a):

The General Assembly finds that:

(1) organized crime is a highly sophisticated, diversified, and widespread phenomenon which annually drains billions from the national economy by various patterns of unlawful conduct including the illegal use of force, fraud, and corruption;

(2) organized crime exists on a large scale within the Commonwealth of Pennsylvania, engaging in the same patterns of unlawful conduct which characterizes its activities nationally;

(3) the vast amounts of money and power accumulated by organized crime are increasingly used to infiltrate and corrupt legitimate businesses operating within the Commonwealth, together with all of the techniques of violence, intimidation, and other forms of unlawful conduct through which such money and power are derived;

(4) in furtherance of such infiltration and corruption, organized crime utilizes and applies to its unlawful purposes laws of the Commonwealth of Pennsylvania conferring and relating to the privilege of engaging in various types of businesses and designed to insure that such businesses are conducted in furtherance of the public interest and the general economic welfare of the Commonwealth;

(5) such infiltration and corruption provide an outlet for illegally obtained capital, harm innocent investors, entrepreneurs, merchants and consumers, interfere with free competition, and thereby constitute a substantial danger to the economic and general welfare of the Commonwealth of Pennsylvania; . . .

(1985)). Although *Wetton* is a non-binding plurality opinion, no member of the Court expressly disagreed on this issue. Today, the majority fails to give any reason for such a startling turnaround on this point in such a short period of time.

I believe that the conduct of our General Assembly is more revealing of their intent than a preamble heavily borrowed from the federal statute. I find persuasive the inaction of the General Assembly in light of the overwhelming judicial interpretation of "enterprise" including illegitimate enterprises within the reach of Racketeer Influenced and Corrupt Organizations statutes. In addition to the United States Supreme Court and numerous lower federal courts, our Superior Court rendered such an interpretation in *Commonwealth v. Yacoubian*, 339 Pa.Super. 413, 489 A.2d 228 (1985). In *Yacoubian*, a panel of our Superior Court held: "This section enables law enforcement to reach the criminal enterprise which has no legitimate dimension or has yet to achieve one." *Id.* at 420–21, 489 A.2d at 231. Presumably aware of the case law in the federal courts and throughout the country, the General Assembly amended the Act in 1974, 1978, 1980, and 1990. Each time, the General Assembly failed to alter section 911 to limit its reach to only legitimate businesses. To me, this inaction on the part of the General Assembly is more revealing of its intent than the single sentence of the preamble quoted by the majority. In fact, the course suggested by the majority is so contrary to the generally accepted interpretation of Racketeer Influenced and Corrupt Organizations statutes, that I believe the General Assembly would have clearly and strenuously indicated its departure from the norm. Its failure to do so strongly suggests agreement with the generally accepted interpretation offered by our Superior Court and the federal courts.

For the reasons set forth above, I must dissent from the majority's departure from the widely recognized principle that illegitimate enterprises are within the reach of Racketeer Influenced and Corrupt Organizations statutes and its decision to chart an ill-conceived new path in this area of the law.

20

Accordingly, I would affirm the Order of the Superior Court in its entirety.

CASTILLE and NEWMAN, JJ., join in this dissenting opinion.