COMMONWEALTH of Pennsylvania

v.

Louis SHAFFER, Appellant.

Superior Court of Pennsylvania.

Argued Nov. 13, 1996.

Filed June 13, 1997.

Thomas R. Ceraso, Greensburg, for appellant.

Andrea F. McKenna, Deputy Atty. Gen., Harrisburg, for Com., appellee.

Before HUDOCK, FORD ELLIOTT and HESTER, JJ.

FORD ELLIOTT, Judge:

This appeal is taken from a judgment of sentence imposed October 31, 1995, after appellant was found guilty by a jury of possession of a controlled substance, possession with intent to deliver a controlled substance, delivery of a controlled substance, criminal conspiracy, corrupt organizations, and corrupt organizations (conspiracy).

The factual underpinnings of this case are rather complicated. Appellant's convictions originated with the delivery of information from a confidential source that there was a low-level street drug dealer of marijuana and cocaine operating in the Kittanning area of Armstrong County. Based on the tip, the Pennsylvania Attorney General's Regional Narcotics Task Force began an investigation, which utilized confidential informants, controlled drug purchases, and physical and electronic surveillance, including wiretaps and pen registers.

The source of drugs for the suspected low-level dealer was found to be one William Todd North. Agents who conducted surveillance of North determined that his supplier

was one Ivan Shankle.[1] Agents arrested North for possession of marijuana and cocaine in November of 1989, and subsequently obtained North's cooperation in the investigation. As a result, on November 9, 1989, North made two controlled buys of cocaine from the Shankles. North testified that at the time he made the second purchase, appellant and Robert Hockenberry were both present at the Shankle residence. (Notes of testimony, 2/10/93 at 80.)

The Narcotics Task Force obtained a record of long distance telephone calls made from the Shankle residence. Agents also requested and received permission to install a pen register (to record the telephone numbers of outgoing calls) on the Shankles' telephone. The pen register recorded many calls to the Hockenberry residence and several to appellant's residence. Agents subsequently applied for and received authorization for a wiretap, to record phone conversations on the Shankle telephone, for 30 days beginning on January 31, 1990. Agents then successfully applied for a 30–day extension of the wiretap.

From these telephone intercepts, and information from North, agents learned that Ivan Shankle planned to travel to New York with several other individuals to purchase a kilogram of cocaine for $28,000. Agents followed these individuals by car, but were discovered. The New York trip was therefore not completed. Agents subsequently confronted Ivan Shankle with what they had learned about his drug sales, and confiscated his drug funds. Shankle gave a detailed statement to agents concerning his involvement in the drug-selling operation. Shankle initially refused to cooperate in the investigation of Robert Hockenberry. In March of 1991, however, Shankle offered his cooperation to the Narcotics Task Force. Ultimately, a special grand jury returned an indictment for appellant and over twenty additional co-defendants, including his co-defendants Robert and Sherry Hockenberry. Ivan and Dorothy

Shankle eventually testified for the Commonwealth at appellant's trial.

Dorothy Shankle testified that she met appellant through Hockenberry, when the two came to see her husband, Ivan Shankle, at the Shankle home. (Notes of testimony, 2/10/93 at 216.) She stated that Hockenberry and appellant supplied Shankle with cocaine. (*Id.* at 218.) Dorothy Shankle further testified that she delivered proceeds from drug sales to appellant and Hockenberry on behalf of Ivan Shankle. (*Id.* at 219.)

Ivan Shankle testified that he had known Hockenberry practically all of his life. (*Id.* at 262.) He stated that he obtained cocaine from appellant and Hockenberry (*Id.* at 265, 272–273), and that he began dealing in cocaine with appellant within two weeks of the commencement in 1989 of his drug-selling career (*Id.* at 272). Ivan Shankle stated that Hockenberry and appellant were "like a team." (*Id.*; *Id.* at 275–276.) Shankle testified that he discussed the first New York volume drug-buying trip with appellant. (*Id.* at 291.) He also discussed with appellant the fact that Narcotics Task Force agents confiscated $28,000 in drug proceeds from him. (*Id.* at 303.)

Todd North testified that in the course of attempting to obtain cocaine from Hockenberry, appellant arrived at Hockenberry's residence to speak with him. (*Id.* at 95–97.) North stated that he heard the men conversing about going over Ivan Shankle's head to sell cocaine to North. (*Id.* at 97–98.)

Following a verdict of guilty, post-trial motions requesting a new trial and/or arrest of judgment were denied by order dated August 10, 1995.

Appellant raises three arguments:

1.) whether the trial court erred in failing to grant appellant's motion for arrest of judgment on the corrupt organization charges, where, as here, there was no legitimate business enterprise as required by our supreme court?

---

1.  We note that Ivan Shankle and his wife, Dorothy Shankle, were indicted with Shaffer in the same grand jury presentment which eventually led to appellant's conviction. The Shankles eventually became the Commonwealth's principal witnesses, whose testimony was reviewed at length by this court at Nos. 1952 Pittsburgh 1995 and

2.) whether the trial court erred, and a new trial should be granted, when it failed to grant appellant's motion to suppress statements obtained through the use of electronic surveillance?

3.) whether the trial court erred in denying appellant's motion to sever and, in the alternative, in denying appellant the right to cross-examine a key Commonwealth witness regarding his prior incarceration with appellant's co-defendant?

Appellant's brief at 3.

Concerning the first argument, appellant directs our attention to Counts V and VI of the Commonwealth's information, which charged violation of and conspiracy to violate the Pennsylvania Corrupt Organizations Act, 18 Pa.C.S. § 911 *et seq.* (hereinafter "C.O.A." or "Act"). Both Counts describe the illegal drug selling enterprise in which appellant was engaged, in violation of § 911(b)(3) and (b)(4).

The crux of appellant's first argument is that his conviction under the Act cannot be upheld because the enterprise in which he was involved was not a legal entity. In support of this argument, appellant relies on the recent Pennsylvania Supreme Court decision, *Commonwealth v. Besch,* 544 Pa. 1, 674 A.2d 655 (1996), issued six months after his convictions, which defined the term "enterprise" for purposes of the Act. In *Besch,* as here, the defendant was found guilty of violating the C.O.A. on the basis of numerous drug trafficking offenses. Based upon an examination of the preamble to the Act, however, the *Besch* court concluded that the statute was not intended to encompass the "prosecution of a wholly illegitimate enterprise." *Id.* at 3, 674 A.2d at 655. While the court had examined the Act's preamble in earlier cases, *Besch* was the first instance in which the supreme court interpreted the C.O.A. in this restrictive manner, so as to reverse a conviction.

Prior to *Besch,* and as late as 1994, the supreme court reviewed and upheld convictions under the C.O.A. which were based upon a defendant's participation in an illegal enterprise. *See Commonwealth v. Wetton,* 537 Pa. 100, n. 5, 641 A.2d 574, 579 n. 5 (1994) (equally divided court affirming superior court; plurality noting that "neither the preamble nor the express language of the statute prevents its proscription from reaching enterprises organized and existing for illegal purposes," *citing with approval Commonwealth v. Yacoubian,* 339 Pa.Super. 413, , 489 A.2d 228, 231 (1985)); *Commonwealth v. Bobitski,* 534 Pa. 310, , 632 A.2d 1294, 1296 (1993) (individual who committed series of methodical crimes not subject to Act, because statute was intended to prevent infiltration of legitimate business by organized crime, and to target organized crime "as it is commonly understood"; intent of statute was to punish those who engage in organized crime through pattern of racketeering activity); *Commonwealth v. Yacoubian, supra* (relying on *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)).

In summary, although the supreme court acknowledged that the express intent was to prevent the invasion of legitimate enterprises by organized crime, the Act was historically interpreted so as to reach illegitimate as well as legitimate enterprises. The majority in *Besch,* however, citing the preamble of the C.O.A., found the statute to be limited to legitimate businesses. The preamble states, in pertinent part:

§ 911. **Corrupt organizations**

(a) **Findings of fact.**—The General Assembly finds that:

(1) organized crime is a highly sophisticated, diversified, and widespread phenomenon which annually drains billions of dollars from the national economy by various patterns of unlawful conduct including the illegal use of force, fraud and corruption;

(2) organized crime exists on a large scale within the Commonwealth of Pennsylvania, engaging in the same patterns of unlawful conduct which characterizes its activities nationally.

(3) the vast amounts of money and power accumulated by organized crime are increasingly used *to infiltrate and corrupt legitimate businesses operating within the Commonwealth,* together

with all of the techniques of violence, intimidation, and other forms of unlawful conduct through which such money and power are derived;

(4) in furtherance of such infiltration and corruption, organized crime utilizes and applies to its unlawful purposes laws of the Commonwealth of Pennsylvania conferring and relating to the privilege of engaging in various types of business and designed to insure that such businesses are conducted in furtherance of the public interest and the general economic welfare of the Commonwealth;

(5) such infiltration and corruption provide an outlet for illegally obtained capital, harm innocent investors, entrepreneurs, merchants and consumers, interfere with free competition, and thereby constitute a substantial danger to the economic and general welfare of the Commonwealth of Pennsylvania.

*Besch, supra* at 9, 674 A.2d at 659, *citing* 18 Pa.C.S. § 911(a) (emphasis supplied).

Concerning the preamble just set forth, the court further opined:

[t]here is no escaping the clear intent of this statute. The General Assembly went to great pains to set forth the parameters of this piece of legislation. *Pa. C.O.A. is directed at preventing the infiltration of legitimate business by organized crime in order to promote and protect legitimate economic development within Pennsylvania.*

*Id.* (emphasis supplied).

If *Besch* were the last relevant pronouncement concerning the scope of the corrupt organizations statute, we would be constrained to reverse appellant's conviction. It is not. Within two weeks after the *Besch* decision, the Pennsylvania legislature amended the statute, and in so doing expressed its disagreement with the supreme court's ruling. The legislature stated that it never intended to exempt illegal or illegitimate businesses from the reach of the Act.

▮ We recognize that the formal purpose of the this court is to maintain and effectuate the decisional law of the supreme court as faithfully as possible. *Commonwealth v.*

*Fiore,* 445 Pa.Super. 401, 665 A.2d 1185 (1995). Even mindful of this fundamental principle, however, to apply the rationale of *Besch* in disposing of the instant case would be to ignore the intent of the legislature, despite the *Besch* court's belief that it correctly had discerned and applied same. This court is also beholden, pursuant to the rules of statutory construction, to determine and effectuate the intent of the General Assembly when construing statutes. 1 Pa.C.S. § 1921(a); *Commonwealth v. Henderson,* 444 Pa.Super. 170, , 663 A.2d 728, 732 (1995) (*en banc*). Accordingly, we must consider the intervening circumstance of the General Assembly's comments in clarifying the Act. We affirm the judgment of sentence.

Review of a statute is accomplished through the principles of the Statutory Construction Act, 1 Pa.C.S. § 1901 *et seq.* As stated above, our goal in interpreting a statute is to ascertain and give effect to the intentions of the General Assembly. Where the words used in a statute are not explicit, the General Assembly's intent is to be discerned by considering the following:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921(c).

▮ Equally relevant to our task here is the well-settled principle that where the legislature fails to take action after a court interprets a statute, it is presumed that the court's interpretation was consistent with legislative intent. *Commonwealth v. Wanamaker,* 450 Pa. 77, 296 A.2d 618 (1972); *In Re Employees of Uniontown Hospital Asso-*

*ciation*, 432 Pa. 146, 247 A.2d 621 (1968); *Henderson, supra.* Conversely, where the legislature speaks so as to make clear that a court's interpretation does not perpetuate legislative intent, we must follow the legislature's guidance concerning the aim of the legislation. Comments made by legislators during the ratification process are permissible guidance for ascertaining the intended purpose. *Henderson, supra.*

■ At issue here is that part of the preamble to the Act which purports to set forth the parameters thereof:

> (3) the vast amounts of money and power accumulated by organized crime are increasingly used *to infiltrate and corrupt legitimate businesses operating within the Commonwealth*, together with all of the techniques of violence, intimidation, and other forms of unlawful conduct through which such money and power are derived.

18 Pa.C.S.A. § 911(c), *cited in Besch* at 9, 674 A.2d at 659. We proceed to a review of the recorded history of the amendment to the Act. The House of Representatives' amendment to the statute, prompted by *Besch*, is set forth in the following:

> MR. MASLAND: ... In an April 17 decision, our Supreme Court, by a four-to-three vote, decided that the Pennsylvania Corrupt Organization's Act did not apply to those corrupt organizations who wholly engaged in illegal activities. In other words, they said, a corrupt organization had to also be involved in legitimate business enterprises for that to come under the purview of the Corrupt Organizations Act. That is contrary to ever[y] other State that has inter[preted] a similar statu[t]e. That is contrary to the United States Supreme Court interpretation of the RICO Statute, and I think it sets up the anomalous situation where you could have a business engaged in loan-sharking, prostitution, theft, you name it, and they would be immune from prosecution. That was not the intent, I do not believe, of this legislature back in 1970 when the act was passed. I do not think it is our intent today, and I think we ought to join with Chief Justice Nix in his dis[s]enting opinion, along with Justices Castille and San-

dra Schultz Newman, and change our act so that the rest of the Supreme Court understands what we intend. Thank you.

Act 55, 180th Legis. (Pa.1996). The Senate voted on the amendment made by the House, the recorded history of which follows:

> Senator FISHER. Mr. President, Senate Bill No. 1172, of which I was the prime sponsor when it was originally introduced in the Senate, proposed a simple change to our RICO statute that has been on the books since 1970 that added money laundering to our definition of racketeering. The issue before the Senate here today is the amendments which have been made by the House to that bill while it was in the House of Representatives. What is it exactly that the House did to Senate Bill No. 1172? They made some other changes to the sections on broadening racketeering activities contained within the definition, *but most importantly, Mr. President, the House of Representatives, in the action which they took on April 30, added amendments to that bill in an attempt to overrule the decision of the majority, the four-person majority of the Pennsylvania Supreme Court on April 17.* Mr. President, in explaining what the House did in adding that amendment, it is necessary for me, just for a moment, to explain what that case was all about. That case in *Commonwealth v. Besch* is a classic case where the evidence showed a broad drug conspiracy or enterprise for which the defendant, Mr. Besch in that case, was convicted by a jury in Mifflin County of various violations of the Drug, Device, and Cosmetic Act and various violations of the Pennsylvania Corrupt Organizations Act. The four-member majority of the Supreme Court handed down a decision which was not only surprising to me but it was a strange decision based on the facts of that case, and it was a very narrow decision, and it clearly was a decision which was a deviation from a long line of cases interpreting Pennsylvania's RICO statute, not just in Pennsylvania but by the Federal courts.
>
> The Pennsylvania Supreme Court's majority said that RICO did not apply in the *Besch* case because the enterprise in-

volved, and as I mentioned earlier, it was an extensive drug enterprise, and there was extensive evidence and testimony on the record of the breadth of that enterprise. The court ruled that the statute did not apply because the enterprise involved was an illegitimate enterprise, not a legitimate one. The court used as a basis for their reasoning one section in the preamble to Pennsylvania's Corrupt Organizations Act in which they hung their hat almost exclusively on the fact that one of those sections of the preamble from which they interpreted our legislative intent when that statute was passed in 1970, they said that section of the preamble meant that this statute only applied to legitimate enterprises.

Mr. President, as I indicated before, the court's decision in *Besch* was a significant deviation, not just from Pennsylvania law but from law that was enunciated by courts in other States which have interpreted similar statutes, the Federal courts in a decision of the United States Supreme Court. In fact, Mr. President, in 1985 the Pennsylvania Superior Court, in a case similar to the Besch case, interpreted that, in fact, our RICO statute applied to legitimate and illegitimate enterprises. Since 1985, this General Assembly obviously took no action to correct the decision of the Pennsylvania Superior Court, and by our inaction and, in fact, by our subsequent amendments to the RICO statute, at least in 1990, we implied that we agreed with the Superior Court's intention of what our intent was. In addition, Mr. President, the United States Supreme Court, in the case *United States v. Turkette* in 1981, in interpreting the Federal statute after which our statute was patterned, interpreted that, in fact, the Federal statute applied not only to legitimate but also to illegitimate enterprises. In addition, in 1994, the very court that acted in the *Besch* case decided in the case of *Commonwealth v. Wetton* in 1994, by a plurality opinion, that, in fact, it upheld a case very similar to *Besch*.

Mr. President, in addition to that, the long line of cases in other jurisdictions tells me and tells many others, including Pennsylvania's Attorney General Tom Corbett, including the members of the District Attorneys Association of Pennsylvania, including Philadelphia District Attorney, Lynne Abraham, that that court decision wrongly interpreted what our legislative intent was. What we are doing here today, Mr. President, is *we are not expanding the scope of Pennsylvania's Corrupt Organizations Act, but very clearly what we are doing by concurring with the amendments added by the House of Representatives is we are clarifying that statute to say that, in fact it is our intent that drug organizations and drug enterprises across Pennsylvania and other illegitimate enterprises across Pennsylvania were intended to be covered by this statute.* Mr. President, it is very important, in my opinion, that prosecutors across Pennsylvania have the ability in certain cases to go after an entire enterprise and try to bring the weight of Pennsylvania's Corrupt Organizations Act after those enterprises to make sure that our laws are as stiff in Pennsylvania as they are in other States.

Mr. President, to not act at this time and to allow the Supreme Court's decision in the case of *Commonwealth v. Besch* to stand would mean that we would be in the distinct minority of States across this country and would have one of the narrowest interpretations of what the Corrupt Organizations Act means in the Commonwealth of Pennsylvania.

Mr. President, I believe that not only are the amendments added by the House the right amendments, they are the appropriate amendments and they are the needed amendments that we need to make sure that Pennsylvania can continue to go after not just legitimate enterprises to try to infiltrate those enterprises with profits of illegal crime, but also to go after illegitimate enterprises and to make sure that police and district attorneys and the Attorney General have the tools to try to stamp out organized crime activities across this great Commonwealth.

Mr. President, I ask that the Senate concur in the amendments made by the House to this very important piece of legislation.

Thank you, Mr. President.

S.B. 1172, 180th Legis.; Pa. Legis. Journal No. 36, at pp. 2028–2029 (June 5, 1996) (emphasis supplied). The Senate thus subsequently passed the House's amendment to the Pennsylvania Corrupt Organizations Act by a unanimous vote. It was signed into law by Governor Ridge on June 19, 1996, effective immediately.[2]

Appellant's reliance upon *Besch, supra,* which arrives at a result contrary to what the legislature intended, cannot afford relief. As stated above, the General Assembly's failure to act, after the supreme court interprets a statute, indicates its agreement with that interpretation. *Wanamaker, supra; Employees of Uniontown Hospital, supra; Henderson, supra.* Rather than acquiesce here, however, the legislative intent concerning the C.O.A. is unequivocally demonstrated by its commentary above, and we must adhere to it in disposing of appellant's first argument. We affirm the judgment of sentence.

While appellant has not argued that application of the C.O.A. to his case is barred based upon the prohibition against *ex post facto* laws, the Commonwealth has devoted considerable attention to this point. We shall address it succinctly. The supreme court recently cited a pre–1800 case which it found correctly defined the meaning of an *ex post facto* law as:

> 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates a crime,* or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offense, *in order to convict the offender.*

*Commonwealth v. Young,* 536 Pa. 57, , 637 A.2d 1313, 1317 (1993), *citing Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648, 650 (1798) (opinion of Chase, J.) (emphasis in original).

█ The application of this principle in appellant's situation offends none of the above-enumerated proscriptions. At the time of appellant's conviction, his activities were clearly considered to be covered by the C.O.A. As set forth above, the Pennsylvania Supreme Court did not interpret the C.O.A. in a manner as to exclude all illegitimate enterprises from its reach until *Besch, supra,* in April of 1996. The C.O.A., even after its amendment or clarification, cannot be said to have been unjustly or retroactively applied to appellant.

█ Appellant's second argument is that he is entitled to a new trial because the trial court failed to grant his motion to suppress his statements obtained through electronic surveillance. Appellant contends that narcotics agents had probable cause to believe that appellant's communications would be intercepted, but nonetheless failed to name him as a target, and therefore information obtained through the wiretap should have been suppressed. Appellant relies upon *Commonwealth v. Whitaker,* 519 Pa. 77, 546 A.2d 6 (1988).

Instantly, at the time the Commonwealth pursued a wiretap, it was aware only that the Shankles were phoning appellant, and that appellant was present at the time that Shankle was selling drugs from his home. The court determined, after appellant's pre-trial suppression hearing, that this information did not rise to the level of probable cause to believe that appellant was dealing drugs. (Suppression court opinion, 10/29/92 at 5.) The suppression court noted that appellant's telephone was not being monitored. (*Id.*) Appellant, in short, could not properly have been named as a target at that time because his involvement was not known to authorities, and the suppression court did not err in refusing appellant's request to suppress his intercepted conversations.

Neither the Wiretap Act, 18 Pa.C.S. § 5701 *et seq.,* nor *Whitaker, supra,* requires that individuals whose communications are intercepted by electronic surveillance be

---

**2.** For our purposes here, the relevant portion of the amendment to section 911 is as follows:

identified in an order granting such surveillance. In fact, the same argument now raised by appellant was rejected by the *Whitaker* court. As that court held, an applicant for a wiretap cannot be expected to name individuals, unknown to them, whose communications might be intercepted. *Whitaker*, 519 Pa. at 82–84, 546 A.2d at 9. Rather, to secure a wiretap, an affiant must provide this court with an affidavit setting forth the "identity of the *particular person*, if known, committing the offense and whose communications are to be intercepted," i.e., the target. 18 Pa.C.S. § 5709(3)(i).

■ As did the defendant in *Whitaker*, appellant also contends that resort to electronic surveillance was improper in this case, because normal investigative procedures would have sufficed. The record is plain concerning this matter. Prior to issuance of the intercept order, the issuing authority (a superior court judge) must determine that "normal investigative procedures with respect to such offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ." 18 Pa.C.S. § 5710(a)(3). Here, that determination was made and the application granted. The suppression court affirmed this determination, and noted that the intercepts were needed to determine the extent of the illegal drug enterprise. (Suppression court opinion, 10/29/92 at 6–7.)

The record supports the suppression court's decision. Here, the co-affiant, Agent Wagner, testified that telephone toll records and physical surveillance were inadequate or impossible as a means for investigation. The affidavit in support of the wiretap also set forth the futility of using undercover agents, due to the suspicion with which "outsiders" were regarded by the drug enterprise. Moreover, the affiant herein was an experienced Narcotics Task Force Agent who was well versed in the investigation of drug enterprises. As did the court in *Whitaker*, we find that the above factors justified the use of electronic surveillance. The suppression court did not err.

Appellant's third and final argument is that the trial court erred in denying his motion to sever and, in the alternative, in denying him the right to cross-examine a key Commonwealth witness regarding prior incarceration with appellant's co-defendant. Although this argument is somewhat unclear, appellant appears to contend that severance of trials should have been granted because hostility allegedly existed between him and co-defendant Hockenberry.

Prior to trial, appellant's counsel argued that Hockenberry and co-conspirator Todd North were selling drugs together prior to the drug sales which are the subject of appellant's convictions. They were then arrested and jailed together. (Notes of testimony, 2/10/93 at 7–8.) Counsel contended that he was entitled to delve into the fact of their joint incarceration *to show* North's potential for bias against appellant in favor of Hockenberry, and that there was a possibility that North would sacrifice and expose appellant in order to protect Hockenberry. (*Id.* at 7–9.)

The court found that appellant's theory of bias based upon joint incarceration was speculative and insufficient justification for severance of appellant's and Hockenberry's trials. (*Id.* at 24–25; trial court opinion, 8/10/95 at 9–10.)[3] We shall not disturb this finding.

■ A motion for severance is addressed to the sound discretion of the trial court, which decision will remain undisturbed absent a manifest abuse of discretion. *Commonwealth v. Jones*, 530 Pa. 591, , 610 A.2d 931, 936 (1992) (citations omitted). Where, as here, defendants are charged with conspiracy, a joint trial is the favored method of disposition. *Id.*

■ In addition, appellant's assertion that hostility existed between him and Hockenberry, and that North may try to implicate

---

**3.** The court also found that the motion to sever was made untimely. (Trial court opinion, 8/10/95 at 10.)

(3) 'Enterprise' means any individual, partnership, corporation, association or other legal entity, and any union or group of individuals

association in fact although not a legal entity, engaged in commerce *and includes legitimate as well as illegitimate entities and government entities*.
18 Pa.C.S.A. § 911 (underlining indicates amended text).

appellant for personal reasons, has been held to be an insufficient basis for severance. *See Id.* Severance is proper only where the proposed defenses of co-defendants are patently antagonistic, not merely in conflict. *Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439 (1995). Defenses are deemed to be antagonistic only where the jury must disbelieve the testimony of one co-defendant in order to believe the testimony offered on behalf of another co-defendant. *Id.; Commonwealth v. Lambert*, 529 Pa. 320, 603 A.2d 568 (1992). Although appellant alleges that North and Hockenberry's joint incarceration caused North to harbor a bias against appellant in favor of Hockenberry, appellant offers no rational basis for his assumption; arguably, it is equally likely that their joint incarceration bred only contempt. The trial court correctly concluded that the fact of the joint incarceration was a speculative basis upon which to make a finding of bias. Further, as this court has recognized, mere bare assertions of conflict cannot form the basis for severance. *Jones, supra.*

■ As for appellant's contention that the trial court erred in prohibiting him from cross-examining Todd North concerning his relationship with Hockenberry, we find it to be spurious. The trial court's opinion makes eminently clear that North was subject to a thorough, probing cross-examination, which included the topic of his affiliation with Hockenberry. (Trial court opinion, 8/10/95 at 10–11.) Our review of the record supports the court's conclusion concerning the quality of cross-examination at trial. The notes of testimony reveal that North was questioned whether he was facing charges at the time he testified. (Notes of testimony, 2/10/93 at 60.) He testified to his prior record (*Id.* at 62–64), and that charges against him in this case were dismissed as a result of his cooperation with Narcotics Task Force agents (*Id.* at 65–66). It was established that North was a heavy drug user, and that he was familiar with the appearance and packaging of drugs. (*Id.* at 73–77.) North further testified to making controlled buys from Hockenberry (*Id.* at 89–90) and that Shaffer was involved in the sales (*Id.* at 95–97).

In addition, on cross-examination by appellant's counsel, North conceded that he was still a drug addict. (*Id.* at 106, 110.) North also conceded that he had lied to the grand jury. (*Id.* at 108.) North stated that he cooperated with authorities with the goal of obtaining favorable treatment. (*Id.* at 114–123.) Appellant's counsel further established that North was not truthful with investigating authorities regarding his drug use and sales of drugs while cooperating. (*Id.* at 128–129.) Counsel also suggested that North's memory was impaired due to his heavy drug use. (*Id.* at 134.) North further stated that he owed money to Ivan Shankle for drugs. (*Id.* at 138–139.)

Further, and as the trial court stated in its opinion, the fact that North was incarcerated with Hockenberry would have revealed a prior crime committed by Hockenberry. (Trial court opinion 8/10/93 at 10.) The court correctly held that this evidence would not have been admissible in a separate trial against Hockenberry, nor would it have been admissible at the joint trial. *Id.* In sum, the court's denial of a new trial was proper.

On the basis of the rationale and authority set forth above, we affirm the judgment of sentence.