936 A.2d 12

COMMONWEALTH of Pennsylvania, Appellant/Cross–Appellee,

v.

Christopher WILLIAMS, Appellee/Cross–Appellant.

Supreme Court of Pennsylvania.

Submitted Dec. 27, 2004.

Decided Nov. 26, 2007.

368

Hugh J. Burns, Esq., Amy Zapp, Esq., Catherine L. Marshall, Philadelphia, for Commonwealth of Pennsylvania.

Anne L. Saunders, Esq., Victor J. Abreu, Jr., Esq., Harrisburg, for Christopher Williams.

BEFORE: CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

## OPINION

Justice CASTILLE.

In consolidated cross-appeals in this capital case, the Commonwealth appeals the May 29, 2003 order of the Court of Common Pleas of Philadelphia County ("PCRA court") granting Christopher Williams (hereinafter, "appellee") a new trial pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.*, while appellee, as cross-appellant, appeals the May 14, 2002 order of the PCRA court dismissing in part certain claims contained in his PCRA petition. For the reasons that follow, we affirm the PCRA court's May 29, 2003 order to the extent that it vacated appellee's conviction for violating the Pennsylvania Corrupt Organizations Act ("Pa. C.O.A."); we reverse the PCRA court's May 29, 2003 order to the extent that it granted appellee a new trial; we vacate the portion of the PCRA court's May 14, 2002 order dismissing appellee's claims; and we remand the matter for a more thorough consideration of those claims.

Beginning in late July 1993, appellee and two co-defendants, Rick Bennett and Theopolis Wilson, were tried by a jury sitting before the Honorable Paul Ribner. On August 6, 1993, the jury convicted appellee of three counts each of first-degree murder (victims Gavin Anderson, Kevin Anderson, and Otis Reynolds),[1] robbery,[2] and criminal conspiracy,[3] as well as one count of violating the Pa.C.O.A.[4] and one count of possessing an instrument of crime ("PIC").[5] The jury acquitted appellee of a fourth count of first-degree murder (victim William Graham) and a count of Pa.C.O.A. conspiracy.[6] According to the facts advanced at trial, appellee was the leader of a group of conspirators that bought and sold drugs and guns, robbed other drug dealers, and on occasion murdered drug dealers

1. 18 Pa.C.S. § 2502(a).
2. 18 Pa.C.S. § 3701.
3. 18 Pa.C.S. § 903.
4. 18 Pa.C.S. § 911(b)(3).
5. 18 Pa.C.S. § 907.
6. 18 Pa.C.S. § 911(b)(4).

after robbing them. The instant convictions arose from an incident occurring in the Germantown section of Philadelphia where appellee shot and killed Gavin Anderson, Kevin Anderson, and Otis Reynolds after appellee and his fellow conspirators had robbed the victims. The three victims themselves were drug dealers who were lured to a meeting with appellee under the pretext of a fake gun sale.[7] Following a penalty hearing, the same jury found three aggravating circumstances: (1) the three murders were committed during the perpetration of the felony of robbery, 42 Pa.C.S. § 9711(d)(6); (2) appellee had a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9); and (3) appellee had been convicted of another murder, 42 Pa.C.S. § 9711(d)(11). The jury found "family considerations" as a mitigating factor pursuant to the "catchall" mitigator. *See* 42 Pa.C.S. § 9711(e)(8) ("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense."). The jury determined that the three aggravating factors outweighed the single mitigating circumstance and, accordingly, set the penalty at death for each of the murders.

After the denial of post-sentence motions, the trial court formally imposed three consecutive death sentences for the first-degree murders, together with terms of imprisonment of 5 to 10 years for each robbery conviction, 2 to 4 years for each conspiracy conviction, 1 to 2 years for the Pa.C.O.A. conviction, and 6 to 12 months for the PIC conviction, all of which were concurrent with each other, but consecutive to the death sentences. On direct appeal, this Court affirmed appellee's convictions and sentences on October 2, 1998. *Commonwealth v. Williams*, 554 Pa. 1, 720 A.2d 679 (1998).[8] Appellee's petition for writ of *certiorari* was denied by the United States Supreme Court on June 7, 1999. *Williams v. Pennsylvania*, 526 U.S. 1161, 119 S.Ct. 2052, 144 L.Ed.2d 219 (1999).

7. The facts underlying appellee's convictions are set forth in detail at *Commonwealth v. Williams*, 554 Pa. 1, 720 A.2d 679 (1998).

8. Appellee was represented by Lee Mandel, Esq. at trial, by Geoffrey Seay, Esq. for post-sentence motions, and by David Rudenstein, Esq. on direct appeal.

On July 15, 1999, appellee filed a timely *pro se* PCRA petition.[9] Thereafter, on October 31, 2000, appellee filed an amended, counseled PCRA petition, which was further supplemented on May 9, 2001. In his amended, counseled PCRA petition, appellee raised twenty-six collateral claims. On June 5, 2001, the Commonwealth filed a motion to dismiss. On May 14, 2002, the PCRA court, per the Honorable William J. Manfredi,[10] issued an order granting the Commonwealth's motion to dismiss in part, dismissing appellee's claims with the exception of one: whether appellate counsel was ineffective for failing to raise the applicability of *Commonwealth v. Besch*, 544 Pa. 1, 674 A.2d 655 (1996) on direct appeal to this Court.[11] With regard to this claim, the PCRA court first determined that appellee's gang was not connected to an otherwise legitimate business enterprise and, accordingly, was wholly illegitimate. The PCRA court then concluded, as a matter of law, that direct appeal counsel had an opportunity to raise *Besch* on appeal, and that if appellate counsel had done so, this Court would have reversed the Pa.C.O.A. conviction. The remaining issue, according to the PCRA court, was whether appellee should be granted a new trial on all charges based on the effect of the admission of the corresponding Pa.C.O.A. evidence at trial. To aid the court in resolving this issue, it ordered an evidentiary hearing to establish what evidence, if any, would not have been admissible had there been no Pa.C.O.A. charges. Additionally, the PCRA court ordered that appellee submit a "*concise* list of all categories of evidence which he claims would have been inadmissible at trial (including citations to trial record), along with *succinct* statements in support of each claim of inadmissibility (including

9. Appellee's petition was timely under 42 Pa.C.S. § 9545(b), having been filed within one year of the U.S. Supreme Court denying *certiorari*.

10. Judge Ribner had retired.

11. During the pendency of appellee's direct appeal, this Court decided *Besch* on April 17, 1996, which was approximately one year before the March 31, 1997 filing date of appellee's brief with this Court. The 4–3 decision in *Besch* held that the Pa.C.O.A. did not apply to wholly illegitimate organizations, such as the drug conspiracy at issue in that case. *Besch*, 674 A.2d at 659–60.

pin-point case citations, where appropriate)." PCRA Ct. Order, 5/14/02, at 2.

Pursuant to the PCRA court's order, on July 10, 2002, appellee submitted a pre-hearing memorandum highlighting a considerable amount of trial testimony that he argued would have been inadmissible had there been no Pa.C.O.A. charges. Appellee further argued that the inadmissible evidence severely tainted the jury's verdict on the other charges, thereby requiring a new trial. Moreover, attached to the memorandum was a signed statement from David Rudenstein, Esq., appellee's direct appeal counsel, stating that he had no tactical or strategic reason for failing to raise a *Besch* claim on direct appeal. The Commonwealth submitted its response on August 19, 2002, primarily arguing that appellee's claim was meritless because he failed to prove actual prejudice. Specifically, the Commonwealth maintained that the Pa.C.O.A. evidence had no bearing on the outcome of the trial because, out of the eight predicate racketeering acts offered to the jury with respect to the substantive Pa.C.O.A. charge, the jury found only three—the murder and robbery of Gavin Anderson, the murder and robbery of Kevin Anderson, and the murder and robbery of Otis Reynolds—and each of those incidents resulted in non-Pa.C.O.A. convictions as well.[12] Therefore, according to the Commonwealth, the jury could not have been tainted by the admission of other crimes evidence where the jury expressly found appellee criminally responsible, under

12. The eight predicate racketeering acts submitted to the jury for the substantive Pa.C.O.A. charges for appellee were the following:
    (1) the murder of William Graham on February 18, 1989;
    (2) the murder and robbery of Gavin Anderson on September 25, 1989;
    (3) the murder and robbery of Kevin Anderson on September 25, 1989;
    (4) the murder and robbery of Otis Reynolds on September 25, 1989;
    (5) the murder and robbery of Michael Haynesworth on November 21, 1989;
    (6) the conspiracy to commit any or all of the above acts;
    (7) the conspiracy to rob a drug dealer known as Troy in early 1989;
    (8) the conspiracy to rob a drug dealer known as Sweetest in early 1989.
Notes of Testimony ("N.T."), 8/4/93, at 120.

the Pa.C.O.A., for only the murders and robberies in which he was the actual shooter.

Although both the Commonwealth and appellee note in their respective briefs that a PCRA hearing was held on October 28, 2002, the record reveals that only a status hearing took place on that date. Accordingly, there is no transcript and no record of testimony offered. In an order dated May 29, 2003, the PCRA court vacated appellee's Pa.C.O.A. conviction, vacated the sentences for the remaining convictions, and granted a global new trial on the non-Pa.C.O.A. charges. In an accompanying opinion, the PCRA court reiterated that appellate counsel had an opportunity to raise *Besch* on direct appeal, and opined that, if he had done so, this Court would have reversed the Pa.C.O.A. conviction. The court then determined that the Pa.C.O.A. evidence admitted at trial was substantial and highly prejudicial, and opined that it would not have been admissible if not for the Pa.C.O.A. charges. This retroactively inadmissible evidence, as noted by the court, included: "testimony regarding criminal acts and conduct by others in the alleged 'organization' which occurred after [appellee] was incarcerated; and evidence of gun transactions, drug activity, robberies and other murders, including a murder for which [appellee] had been acquitted." PCRA Ct. Op., 5/29/03, at 3. The PCRA court noted that the resulting and complicated issue was whether the admission of the Pa.C.O.A. evidence, now rendered inadmissible by *Besch*, required a new trial on all the charges even though *Besch* did not directly affect those charges. The court concluded with a peremptory view grounded in the capital nature of the case, opining that: "[u]ntil and unless the Supreme Court instructs otherwise, we believe that a conviction resulting in a sentence of death must not be based upon highly inflammatory evidence that was only admissible by virtue of the serendipitous timing of a pending challenge to the [Pa.C.O.A.]." *Id.* at 3–4, 674 A.2d 655.

On its appeal, the Commonwealth challenges the relief granted to appellee by the PCRA court in its May 29, 2003 order regarding the *Besch*-ineffectiveness issue. In his protective cross-appeal, appellee challenges the PCRA court's

dismissal of his remaining prolix claims in its May 14, 2002 order in the event we reverse the existing grant of relief.[13] We address the Commonwealth's appeal first because, if the grant of a new trial was proper, there would be no need to review appellee's claims raised on cross-appeal.

Before examining the parties' arguments in the Commonwealth's appeal, an examination of the Pa.C.O.A., *Besch,* and relevant case law is salutary. The Pa.C.O.A. criminalizes the following conduct:

(1) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity in which such person participated as a principal, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise. . . .

(2) It shall be unlawful for any person through a pattern of racketeering activity to acquire or maintain, directly or indirectly, any interest in or control of any enterprise.

(3) It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

(4) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (1), (2) or (3) of this subsection.

13. This Court has jurisdiction over the Commonwealth's appeal as we directly review the grant of post-conviction relief in death penalty cases under 42 Pa.C.S. § 9546(d) and Pa.R.Crim.P. 910. The Court has jurisdiction over appellee's cross-appeal as we directly review final orders denying post-conviction relief in death penalty cases. 42 Pa.C.S. § 9546(d); *Commonwealth v. Morris,* 565 Pa. 1, 771 A.2d 721, 743 n. 1 (2001) (Castille, J., concurring) (explaining that the 1988 version of Section 9546(d) governs following this Court's order dated August 11, 1997 which, *inter alia,* specifically suspended the 1995 and 1997 amendments to Section 9546(d)). Our standard of review in such cases is whether the findings of the PCRA court are supported by the record and free from legal error. *Commonwealth v. Sneed,* 587 Pa. 318, 899 A.2d 1067, 1071 n. 6 (2006).

18 Pa.C.S. § 911(b).[14] "Racketeering activity" is defined as including, *inter alia*, criminal homicide, robbery, kidnapping, arson, theft, gambling, drug offenses, and conspiracy. 18 Pa.C.S. § 911(h)(1)(i)-(iii). The original version of the Pa. C.O.A., as enacted in 1972 (effective 1973), defined the term "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce." 18 Pa.C.S. § 911(h)(3).

Prior to this Court's 1996 decision in *Besch*, the Superior Court had held on multiple occasions that the statutory term "enterprise," as so broadly defined, comprised both legitimate and illegitimate enterprises. *See, e.g., Commonwealth v. Yacoubian*, 339 Pa.Super. 413, 489 A.2d 228, 231 (1985) (holding that "the term 'enterprise' is unrestricted and sufficiently broad to include both legitimate and illegitimate enterprises"). In *Besch*, this Court squarely addressed for the first time the issue of whether the Pa.C.O.A. encompassed a wholly illegitimate enterprise, specifically a drug trafficking operation. The Court sharply divided, 4–3. The *Besch* majority concluded that the General Assembly intended that prosecution of the Pa.C.O.A. not be enforced against wholly illegitimate enterprises, noting the following:

> There is no escaping the clear intent of this statute. The General Assembly went to great pains to set forth the parameters of this piece of legislation. Pa.C.O.A. is directed at preventing the infiltration of legitimate business by organized crime in order to promote and protect legitimate economic development within Pennsylvania.

*Besch*, 674 A.2d at 659. The *Besch* dissent, by then-Chief Justice Nix, responded, among other points, that the plain language of the statute encompassed both legitimate and illegitimate enterprises. *Id.* at 661–62.

Approximately two months after *Besch*, and in apparent direct response to that decision, the General Assembly amend-

---

14. As noted above, appellee was convicted of violating Section 911(b)(3), but the jury acquitted him of violating Section 911(b)(4), the conspiracy subsection.

ed the Pa.C.O.A.'s definition of the term "enterprise" explicitly making clear that the statute targets both legitimate and wholly illegitimate enterprises. The definition of "enterprise" now reads as follows:

"Enterprise" means any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce **and includes legitimate as well as illegitimate entities and governmental entities.**

18 Pa.C.S. § 911(h)(3), *as amended,* June 19, 1996 (effective immediately) (emphasis added).

This Court's next opportunity to address *Besch,* and our first opportunity to discuss the 1996 legislative amendment to the Pa.C.O.A., was in *Commonwealth v. Shaffer,* 557 Pa. 453, 734 A.2d 840 (1999). In *Shaffer,* this Court first determined that the amendment applied only prospectively from the date of its enactment. The *Shaffer* majority then reaffirmed *Besch,* noting that our judicial construction of the Pa.C.O.A. in *Besch* must be deemed to relate back to the date of that statute's enactment:

[O]nce this Court interpreted the legislative language contained in the applicable act, our interpretation became a part of the legislation from the date of its enactment. The legislature's failure to clearly set forth its intent in the original act could only be remedied prospectively by the later amendment.

*Id.* at 844.

Most recently, this Court was confronted with a certified question of Pennsylvania law from the United States Court of Appeals for the Third Circuit in *Kendrick v. District Attorney of Philadelphia County,* 591 Pa. 157, 916 A.2d 529 (2007), asking this Court whether *Besch's* construction of the Pa. C.O.A. established a new rule of law that could not be applied retroactively to cases on collateral review. In a unanimous decision, this Court answered the certified question in the negative, holding that "*Besch* did not establish a new rule of law." *Id.* at 541. In reaching this conclusion, this Court

primarily relied on the new rule and retroactivity principles discussed in *Fiore v. White*, 562 Pa. 634, 757 A.2d 842 (2000) and *Commonwealth v. Eller*, 569 Pa. 622, 807 A.2d 838 (2002), reasoning that those cases commanded "that this Court's interpretation of the term 'enterprise' in *Besch* was not a 'new rule,' but must be deemed to have merely explicated the meaning and scope of the term from the Pa.C.O.A.'s original enactment in 1973." *Kendrick*, 916 A.2d at 538.

In the instant matter, appellee pursues his *Besch*-related ineffectiveness claim under both the United States Constitution and the Pennsylvania Constitution. "It is settled that the test for counsel ineffectiveness is the same under both the Pennsylvania and Federal Constitutions: it is the performance and prejudice test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." *Commonwealth v. Gribble*, 580 Pa. 647, 863 A.2d 455, 460 (2004) (collecting cases). This Court has consistently applied the performance prong by examining both the arguable merit of the claim lodged against counsel in addition to the objective reasonableness of the actions taken by counsel. *Sneed*, 899 A.2d at 1076. A properly pleaded claim of counsel ineffectiveness requires the defendant to rebut the presumption of professional competence by demonstrating that: (1) the underlying legal claim has arguable merit; (2) counsel's actions lacked an objective reasonable basis designed to effectuate his client's interest; and (3) the defendant suffered actual prejudice from counsel's act or omission—*i.e.*, but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 233 (2006) (citing *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987)). The failure to satisfy any prong of the ineffectiveness test will require rejection of the claim. *Sneed*, 899 A.2d at 1076; *see also Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 701 (1998) ("If it is clear that Appellant has not demonstrated that counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on

that basis alone and the court need not first determine whether the first or second prongs have been met.").

The Commonwealth raises several arguments in support of its contention that the PCRA court erroneously granted a new trial. First, the Commonwealth maintains that appellee's current *Besch*-related ineffectiveness claim is previously litigated because this Court decided on direct appeal that the evidence was sufficient to support appellee's Pa. C.O.A. conviction. Commonwealth's Brief at 14–16 (citing 42 Pa.C.S. § 9543(a)(3) (PCRA petitioner must plead and prove by a preponderance of the evidence that his claim has not been previously litigated in order to garner relief)); *see Carson*, 913 A.2d at 234. The issue addressed by this Court on direct appeal, however, is clearly different from the instant ineffectiveness claim and, thus, the present claim is not previously litigated. *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 573 (2005) (ineffectiveness claims are distinct from non-ineffectiveness claims raised on direct appeal). Specifically, on direct appeal, appellee challenged certain testimony by David Lee, who had sold guns and other weapons to appellee and co-defendant Wilson from 1988 to 1990. Appellee argued that Lee's testimony of gun sales made to co-defendant Wilson in 1990 was irrelevant to any of the crimes charged because appellee was incarcerated at that time and was no longer a part of the gang's conspiracy. This Court determined that the trial court erred in admitting evidence of the 1990 gun sales against appellee, but found the error harmless. Notably, we highlighted Lee's testimony as to his direct dealings with appellee regarding the purchase of an AK–47 assault rifle and hand grenades, and James White's [15] testimony that money acquired from robbing and killing drug dealers was used to buy guns and other weapons paraphernalia. This Court concluded that this properly admitted evidence overwhelmingly

---

15. James White was a member of appellee's gang and the Commonwealth's primary witness at the joint trial. White pleaded guilty to six counts of first-degree murder and other offenses and agreed to testify at trial in exchange for the Commonwealth's recommendation that he receive six concurrent sentences of life imprisonment, thus avoiding the death penalty.

established appellee's guilt of violating the Pa.C.O.A. *Williams*, 720 A.2d at 688. The claim so decided did not implicate *Besch* and the question of whether the Pa.C.O.A. encompassed wholly illegitimate enterprises. Nor did the Court address *Besch sua sponte*. Accordingly, appellee's current claim is not barred by the previous litigation provision.

Next, the Commonwealth contends that appellee failed to demonstrate that appellate counsel was ineffective. Citing *Yacoubian* and other Superior Court case law, the Commonwealth maintains that the governing law at the time of appellee's 1993 trial was that the Pa.C.O.A. encompassed wholly illegitimate enterprises. The Commonwealth also highlights the General Assembly's swift reaction to *Besch* by amending the Pa.C.O.A. in 1996 to explicitly include both legal and illegal organizations. The Commonwealth argues that because the 1996 amendment was made effective immediately, the law at the time appellee filed his direct appeal brief (which was before *Shaffer* was decided) was that wholly illegitimate enterprises could be prosecuted under the Pa.C.O.A. Therefore, the Commonwealth argues, counsel cannot be found ineffective for failing to raise *Besch* on direct appeal when case law at the time of trial and during direct appeal supported appellee's Pa.C.O.A. conviction. Commonwealth's Brief at 21–22 (citing *Commonwealth v. Fulton*, 574 Pa. 282, 830 A.2d 567, 575 n. 7 (2003) (Opinion Announcing the Judgment of the Court) ("Counsel's performance must be measured by contemporaneous standards."); *Commonwealth v. Lopez*, 559 Pa. 131, 739 A.2d 485, 500 n. 18 (1999), *cert. denied*, 530 U.S. 1206, 120 S.Ct. 2203, 147 L.Ed.2d 237 (2000) ("Counsel cannot be deemed ineffective for failing to anticipate a change in the law.")).

The Commonwealth additionally asserts that appellee's counsel ineffectiveness claim lacks arguable merit because the evidence admitted in support of the Pa.C.O.A. charges was independently admissible for other proper purposes and, therefore, the contested evidence did not taint appellee's other convictions such that a global new trial was warranted. Specifically, the Commonwealth argues that the testimony ad-

mitted regarding appellee's conspiracy-related activities—for example, other murders and robberies of drug dealers committed by appellee's co-conspirators—was independently admissible under Pa.R.E. 404(b)(2), particularly given that criminal conspiracy was charged.[16] The Commonwealth contends that the disputed evidence was admissible to show: "[appellee's] identity as the gang's mastermind, his intent to conspire and rob drug dealers, and his common scheme of identifying drug dealers who had cash, and then summoning fellow gang members to rob them with guns he provided;" and "to illustrate the complete story and sequence of the triple murder in this case." Commonwealth's Brief at 27–28. Furthermore, the Commonwealth maintains that some of the evidence appellee challenges was not introduced against him for Pa. C.O.A. purposes; rather, the evidence was introduced against co-defendants Wilson and Bennett in support of their Pa. C.O.A. charges. The Commonwealth then highlights that the trial court's instruction charged the jury that evidence could only be considered against the defendant against whom it was introduced, and not against the other two defendants. Commonwealth's Brief at 24–25 (citing *Commonwealth v. Simpson,* 562 Pa. 255, 754 A.2d 1264, 1272 (2000), *cert. denied,* 533 U.S. 932, 121 S.Ct. 2556, 150 L.Ed.2d 722 (2001) ("It is well settled that juries are presumed to follow the instructions of a trial court to disregard inadmissible evidence.")). Therefore, the Commonwealth argues, because the jury is presumed to have followed the court's charge, the jury must be deemed not to have considered that evidence against appellee.

Finally, the Commonwealth maintains that appellee cannot satisfy the prejudice portion of the ineffectiveness standard. This argument, however, focuses more on error in the PCRA court's conclusion that this Court would have vacated appellee's Pa.C.O.A. conviction on direct appeal if appellate counsel

---

**16.** Evidentiary Rule 404(b)(2) provides:

Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.
Pa.R.E. 404(b)(2).

had raised *Besch.* The Commonwealth maintains that such a conclusion rests on two "unsubstantiated assumptions": first, that this Court was not already aware of *Besch* when we reviewed appellee's direct appeal; and second, that this Court would have been willing to issue a contradictory opinion—*i.e.,* a conclusion that appellee could not be prosecuted for violations of the Pa.C.O.A. would directly conflict with our holding that properly admitted evidence at trial "overwhelmingly established [appellee]'s guilt of the corrupt organizations charge." *Williams,* 720 A.2d at 688.

Alternatively, the Commonwealth argues that this Court should overrule *Besch,* "supersede" our statement in *Shaffer* that *Besch's* interpretation of the Pa.C.O.A. relates back to the date of the statute's enactment, *see Shaffer,* 734 A.2d at 844, or classify *Besch* as a new rule of law that applies prospectively. We will address this point first because our recent unanimous decision in *Kendrick, supra,* which was decided after the case *sub judice* was submitted for decision, is instructive. In *Kendrick,* this Court rejected similar arguments offered by the Commonwealth.[17] Notably, regarding the argument that we should classify *Besch* as a new rule of law thereby lacking retroactive effect, this was the exact question certified to this Court by the Third Circuit Court of Appeals. As noted above, we specifically held that, because it construed a statute defining criminal conduct, *Besch* did not establish a new rule of law and, therefore, the *Besch* majority's interpretation of the Pa.C.O.A. applied retroactively to the date of the statute's enactment. *Kendrick,* 916 A.2d at 541. Additionally, we articulated three reasons why it would be unwise for this Court to overrule *Besch. Id.* at 539–40. First, we noted that, although the General Assembly's 1996 amendment applied prospectively, this legislative response was a sufficient remedy for the issues resulting from *Besch.* Second, we noted that the General Assembly's prompt response to *Besch* resulted in a limited number of *Besch*-related claims arising, and that these claims would decrease over time. Third, we noted that this Court disfavored reconsidering precedent on attenuated

---

**17.** We delayed consideration of this appeal pending *Kendrick.*

collateral review, particularly in *Kendrick,* where the certified question did not ask whether we should reconsider *Besch.* Although the tug of *stare decisis* is not as strong here, where the appeal, though collateral, is less attenuated, and where the question is squarely presented, it is strong enough to again decline the Commonwealth's invitation to reconsider and over-rule *Besch.* The fact remains that the Commonwealth's plain-language-of-the-statute interpretation was forwarded in *Besch,* but was rejected by 4–3 vote and the statute was quickly amended. Concerning the Commonwealth's call to "super-sede" *Shaffer,* our thorough analysis of retroactivity principles in *Kendrick,* in this context, requires otherwise. *Id.* at 538–39.[18]

In response to the Commonwealth's substantive claims, appellee argues that the PCRA court correctly determined that direct appeal counsel was ineffective for failing to raise *Besch* on appeal. Appellee maintains that, pursuant to *Besch,* he should not have been prosecuted under the Pa.C.O.A. because his organization was wholly illegitimate. Indeed, appellee notes, at trial the prosecutor asserted in his closing argument that appellee's organization had no connection to a legitimate business: "[I]t [is] irrefutable that these men did have an organization or a gang, the purpose of which was to rob drug dealers." N.T., 8/3/93, at 168. Appellee further maintains that counsel had sufficient time to raise *Besch* on direct appeal since *Besch* was issued approximately one year before counsel filed his appeal brief. *See supra* n. 11. More-over, appellee highlights appellate counsel's statement claim-ing that he had no tactical or strategic reason for not raising

18. In *Kendrick,* in response to the Commonwealth's attempt to distin-guish *Shaffer,* we noted that the statement the Commonwealth now challenges might be *dicta. Kendrick,* 916 A.2d at 539 n. 5. We main-tained, however, the following:

[T]he point being made [in *Shaffer* ] was fully consistent with our [later] holdings and analysis in *Fiore* and *Eller. Besch* was this Court's first construction of the term "enterprise" in the statute and that initial interpretation cannot be labeled a new rule of law-as if we were articulating a common law rule of procedure, rather than reading a statute-but merely stands as an explication of a law which necessarily relates back to the date of the statute's enactment.

*Id.*

*Besch.* Appellee maintains that he was prejudiced by appellate counsel's ineffectiveness and, therefore, this Court would have vacated his Pa.C.O.A. conviction on direct appeal had *Besch* been raised. Appellee further maintains that the PCRA court correctly found that, because of the improper Pa.C.O.A. charges, highly prejudicial and otherwise inadmissible evidence was wrongly admitted for Pa.C.O.A. purposes, and that this improper evidence infected all aspects of appellee's trial. Therefore, according to appellee, the PCRA court's award of a new trial on the non-Pa.C.O.A. convictions must be affirmed.

Appellee extensively sets forth the evidence and arguments offered at his trial that, he asserts, would not have been admissible but for the Pa.C.O.A. charges. Appellee sorts the evidence and arguments into seven categories. In brief, the seven categories are the following: (1) testimony from James White and James McArthur concerning uncharged, unspecified "other crimes"; (2) testimony from James White and co-defendant Bennett, as well as a statement by co-defendant Bennett, regarding the attempted robbery of David Perez that resulted in the murder of Marron Jenrette; (3) testimony from James White and Dr. Ian Hood about the robbery and murder of a drug dealer named Michael Haynesworth; (4) testimony from James White and James McArthur concerning the attempted robbery of drug dealers known as "Troy" and "Sweetest"; (5) testimony from David Lee about illegal gun purchases made by appellee and co-defendant Wilson; (6) surveillance tapes and testimony from U.S. Alcohol, Tobacco, and Firearms ("ATF") Agent Daniel Machonis concerning the attempted purchase of guns, drugs, and bulletproof vests by co-defendant Wilson on behalf of appellee's gang; and (7) references by the prosecutor in his closing argument to portions of the evidence contained in the previous six categories.

Appellee maintains that all of this evidence and argument was introduced solely for Pa.C.O.A. purposes, and that the admission of each piece of evidence prejudiced him. Appellee also disputes the Commonwealth's argument that some of the evidence was introduced against his co-defendants in support

of their Pa.C.O.A. charges, and not against him. This evidence includes testimony concerning the attempted robbery of David Perez that resulted in the murder of Marron Jenrette, and David Lee's testimony about appellee's illegal firearms purchases. Appellee argues that the limiting instruction given by the trial court should have been issued following the relevant testimony, rather than during the final jury instructions, and that the charge when given was vague and imprecise because it allowed the jury to determine what evidence should have a limited use. Moreover, appellee maintains that the Commonwealth claimed during trial and in its direct appeal brief that testimony regarding illegal gun sales was admitted against appellee for Pa.C.O.A. purposes.

Regarding the Commonwealth's argument that the testimony admitted concerning other murders, robberies, and attempted robberies of drug dealers committed by appellee's conspirators would have been admissible under Pa.R.E. 404(b)(2), appellee maintains that the trial court never "exercised its discretion, balanced the probative value of the evidence against its prejudice, crafted a limiting instruction or even addressed this theory of admissibility because the prosecutor did not seek admission of the evidence under the 'other crimes' exception." Appellee's Brief at 36. Therefore, according to appellee, this Court should not conduct this discretionary analysis for the trial court in the first instance. Alternatively, appellee asserts that if this Court were to consider this evidence for Rule 404(b)(2) purposes, the evidence does not fit within any of the recognized "other crimes" exceptions cited by the Commonwealth, namely, identity, intent, common scheme, or history of the case. Moreover, appellee asserts that even if the "other crimes" evidence qualified under one of the exceptions cited by the Commonwealth, the probative value of the "other crimes" evidence would not outweigh the prejudice caused by its admission. *Id.* at 41; *see also* Pa.R.E. 404(b)(3) ("Evidence of other crimes ... proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice."). Further-

more, appellee argues that a trial court is required to issue a cautionary instruction on the limited purpose for which "other crimes" evidence is admitted, and that here the trial court failed to issue such an instruction. Appellee's Brief at 41 (citing *Commonwealth v. Billa,* 521 Pa. 168, 555 A.2d 835, 841 (1989) ("When evidence is admissible for a limited purpose, a defendant is entitled to a limiting instruction.") (quoting *Commonwealth v. Covil,* 474 Pa. 375, 378 A.2d 841, 845 (1977))).

■ The initial issue that this Court must address is whether the PCRA court erred in concluding that appellate counsel was ineffective for failing to claim on direct appeal that, under *Besch,* appellee's Pa.C.O.A. conviction was unsupported by the evidence. Counsel admits in his statement that he was not familiar with *Besch* while representing appellee on direct appeal, and that he had no affirmative tactical or strategic reason for not seeking sufficiency relief premised on the case.[19] We find that, at the time of the direct appeal, there existed no fatal impediments to counsel raising *Besch.* We further find no error in the PCRA court's prediction that, if counsel had raised *Besch* on direct appeal, this Court would have entertained the claim and vacated appellee's Pa.C.O.A. conviction.

■ One impediment to counsel raising a *Besch*-related sufficiency claim on direct appeal, of course, was that no such claim was raised below. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). However, this was and is a capital case, and at the time appellee's direct appeal was litigated, this Court's discretionary relaxed waiver doctrine was in effect. "Under the direct capital appeal relaxed waiver rule, this Court had discretion to reach alleged trial court errors which, although waived, were resolvable from the record." *Commonwealth v. Gribble,* 580 Pa. 647, 863 A.2d 455, 468 n. 9 (2004) (citing *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77

19. No doubt, counsel was more concerned with the murder convictions and the resulting death sentences than with the Pa.C.O.A. conviction.

L.Ed.2d 1327 (1983)).  The relaxed waiver rule was abrogated
in capital PCRA matters in *Commonwealth v. Albrecht,* 554
Pa. 31, 720 A.2d 693, 700 (1998) and in direct capital appeals in
*Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 402–03
(2003), *cert. denied,* 543 U.S. 822, 125 S.Ct. 30, 160 L.Ed.2d 31
(2004).  When faced with collateral claims that direct appeal
counsel was ineffective in failing to invoke then-available re-
laxed waiver to secure review of a claim waived below, this
Court has stressed the difficulty in determining the likelihood
that the Court would have employed the discretionary doc-
trine:

> As this Court noted in *Freeman, supra,* we have routinely
> declined to apply the discretionary relaxed waiver doctrine
> "in many instances, often involving situations where the
> failure to raise a claim below might have fallen within the
> realm of defense trial strategy, or when the absence of a
> contemporaneous objection made it difficult to resolve the
> issue on the record presented."  827 A.2d at 400 n. 9
> (collecting cases).  *See also Commonwealth v. Gribble,* 550
> Pa. 62, 703 A.2d 426, 434–35 (1997) (citations omitted)
> (relaxed waiver did not apply to appellant's suppression
> claim because he withdrew pre-trial motion to suppress and,
> as result, Commonwealth was denied opportunity to respond
> and this Court was left without proper evidentiary record).

*Commonwealth v. Dougherty,* 580 Pa. 183, 860 A.2d 31, 40
(2004); *see also Commonwealth v. Sneed,* 587 Pa. 318, 899
A.2d 1067, 1076 (2006) ("'[A]ppellee 'ignores that this [C]ourt's
relaxed waiver doctrine was discretionary, and thus, there was
no guarantee that we would have analyzed this issue under the
relaxed waiver doctrine.'") (declining to reach waived claim
under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90
L.Ed.2d 69 (1986)) (quoting *Commonwealth v. Duffey,* 585 Pa.
493, 889 A.2d 56, 64 (2005) (declining to reach waived claim
involving penalty phase reference to defendant's exercise of
right to remain silent)).

What distinguishes the *Besch* /sufficiency claim from other
claims, for purposes of assessing whether it would have been
reached on direct appeal notwithstanding its waiver below, is

that such a claim implicates actual innocence on the Pa.C.O.A. charge. Actual innocence means "factual innocence, not mere legal insufficiency," and thereby encompasses a narrow but important class of claims. *Bousley v. United States,* 523 U.S. 614, 623–24, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998). Appellee's claim is premised upon *Besch's* construction of the Pa.C.O.A. as not intended to encompass wholly illegitimate organizations. The Commonwealth does not suggest that appellee's "organization" was other than wholly illegitimate, and therefore, appellee's claim sounds in actual innocence. Colorable claims of actual innocence hold a favored place in the law. *See, e.g., Fiore v. White,* 531 U.S. 225, 226–29, 121 S.Ct. 712, 713–14, 148 L.Ed.2d 629 (2001) (*per curiam*) (on federal habeas review, defendant's conviction held to be inconsistent with federal Due Process Clause because this Court's interpretation of same criminal statute in co-defendant's case regarding basic element of crime related back to date statute was enacted, which made clear that defendant "did not violate the statute"); *Bousley, supra* (federal prisoner who pleaded guilty to federal offense of "using" firearm before U.S. Supreme Court decision construed statutory term "use" to require showing of "active employment of the firearm" later sought habeas corpus relief; held, prisoner could challenge plea and conviction on collateral attack, notwithstanding waiver of challenge on direct review, if he could demonstrate that constitutional error in his guilty plea (in misdescribing offense) probably resulted in conviction of one who is actually innocent); *accord Kendrick v. Dist. Attorney of County of Phila.,* 488 F.3d 217, 219 (3d Cir.2007) ("Because Kendrick was convicted of a violation of the PCOA that the Pennsylvania Supreme Court has held was inapplicable, and therefore his conviction was 'constitutionally invalid,' *see Bousley v. United States,* 523 U.S. 614, 619, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998), we will direct the District Court to grant the writ of habeas corpus to vacate Kendrick's conviction on that count."). Accordingly, we conclude that there is a reasonable probability that this Court on direct appeal would have entertained a claim of actual innocence as to the Pa.C.O.A. charge under the relaxed waiver doctrine.

We recognize the facial logic in the Commonwealth's separate merits argument that, at the time appellee's direct appeal was decided, the Pa.C.O.A. statute had been amended by the General Assembly in response to *Besch;* the Superior Court had held, in *Shaffer,* 696 A.2d 179 (Pa.Super.1997), that the amendment applied retroactively to rescue Shaffer's Pa. C.O.A. conviction; the Superior Court decision in *Shaffer* was not reversed by this Court until after appellee's direct appeal was decided; and accordingly, at the time appellee's direct appeal was litigated, there was an argument to be made that appellee's Pa.C.O.A. conviction should be affirmed notwithstanding *Besch.* Although the question is close, we nevertheless conclude that there is a reasonable probability that, if direct appeal counsel had raised a sufficiency claim premised on *Besch,* this Court would have granted appellee merits relief. As noted in *Kendrick,* well-established retroactivity principles teach that this Court's construction of a statute becomes part of the legislation from the date of its enactment. *See Kendrick,* 916 A.2d at 538; *Fiore, supra; Eller, supra.* Notably, when this Court reversed the Superior Court's retroactivity decision in *Shaffer,* we did so (1) without dissent and (2) by citing existing authority. Therefore, we believe that, if counsel had raised the *Besch* claim on direct appeal, this Court would have determined, as we did in *Shaffer* and in *Kendrick,* that *Besch's* construction of the Pa.C.O.A. related back to the statute's enactment in 1972, and that appellee's conviction for violating the Pa.C.O.A. could not stand as the illegal activities of his wholly illegitimate gang were not captured by the statute. Accordingly, we hold that the PCRA court properly found appellate counsel to be ineffective in this regard, and properly vacated the Pa.C.O.A. conviction. *Cf. Commonwealth v. Cruz,* 578 Pa. 263, 851 A.2d 870, 874–78 (2004) (postconviction petitioner granted collateral relief on claim previously rejected on direct appeal because co-defendant received relief based on materially identical claim).

Moreover, it is worth noting that, even if we agreed with the Commonwealth that there was a deficiency in appellee's claim that appellate counsel was ineffective for failing to raise *Besch,*

the U.S. Supreme Court's holding in *Fiore* makes clear that appellee's Pa.C.O.A. conviction violates due process. Appellee plainly is entitled to collateral relief on the Pa.C.O.A. conviction, whether as a Sixth Amendment matter or a due process matter.

The more difficult issue is whether the PCRA court erred in finding that appellee was entitled to even greater relief than was afforded in *Besch*—i.e., whether he is entitled to a new trial on the non-Pa.C.O.A. charges because evidence concerning the Pa.C.O.A. charges was otherwise inadmissible and prejudiced him. In addressing this issue, the PCRA court engaged in a cursory analysis, focusing in large part on the fact that this was a capital case. The court failed to address the categories of evidence cited by appellee or any of the Commonwealth's arguments that the Pa.C.O.A. evidence was admissible for other valid, independent purposes. Nor did the court analyze the issue pursuant to the *Strickland/Pierce* test for prejudice. The entirety of the PCRA court's discussion of this issue was as follows:

We further find that there was substantial, highly prejudicial evidence adduced in support of the [Pa.C.O.A.] charge, which would not have been admissible had that charge not been at issue at trial. This evidence, unrelated to the homicide charge, included: testimony regarding criminal acts and conduct by others in the alleged "organization" which occurred after petitioner was incarcerated; and evidence of gun transactions, drug activity, robberies and other murders, including a murder for which petitioner had been acquitted.

Clearly, there was a mass of highly prejudicial evidence presented to the jury, which it would never have heard, had there been no [Pa.C.O.A.] charge. However, as we indicated in our opinion on the Motion to Dismiss, the more difficult question is whether appellate law arising after trial, requires us to grant a new trial on charges which were not directly affected by the appellate ruling. Until and unless the Supreme Court instructs otherwise, we believe that a conviction resulting in a sentence of death must not be

based upon highly inflammatory evidence that was only admissible by virtue of the serendipitous timing of a pending challenge to the [Pa.C.O.A.] charge. Accordingly, we are granting a new trial.

PCRA Ct. Op., 5/29/03, at 3–4. The court employed an improper and incomplete approach to resolving this issue.

Initially, it is important to remember that appellee did not anticipate *Besch* and thus did not lodge a trial-level objection to the admission of the Pa.C.O.A. evidence. Nor was there a trial-level determination concerning whether any of the disputed evidence would have been admissible for other purposes. The fact that we have determined that there is a reasonable probability that appellee's Pa.C.O.A. conviction would have been set aside on direct appeal if counsel had invoked *Besch* and therefore counsel was ineffective, does not mean that *Besch*-derivative or *Besch*-tangential claims would have been entertained on direct review, if counsel had raised them. *Besch* did not address derivative evidentiary claims, nor did the majority in that case grant a global new trial. Thus, direct appeal counsel could not invoke *Besch,* or any other case for that matter, as controlling support for a claim that appellee was entitled to a global new trial on the non-Pa. C.O.A. charges, based on the spillover prejudicial effect of Pa.C.O.A. evidence. Furthermore, although appellate counsel theoretically could have requested consideration of the waived, derivative evidentiary claim under relaxed waiver, it is entirely speculative whether the Court would have engaged in such review for, as we have noted above, the doctrine was discretionary. *Sneed, supra; Duffey, supra.* In this regard, it is significant that the derivative evidentiary claim is fact-specific, and would have been unsupported by any trial level record devoted to the issue in that guise—indeed, the PCRA court had to hold an evidentiary hearing and required briefing in order to decide the claim. We conclude that the waived underlying claim, if raised for the first time on appeal, would not have been entertained under relaxed waiver. *See Sneed, supra; Duffey, supra; Commonwealth v. Dougherty, supra; Freeman, supra; Commonwealth v. Gribble,* 550 Pa. 62, 703

A.2d 426 (1997). Thus, we conclude that direct appeal counsel cannot be deemed ineffective for failing to seek relaxed waiver review of the defaulted version of the claim, in the first instance, on direct appeal.

Of course, there was nothing at the time to prevent direct appeal counsel from raising the waived evidentiary claim under the guise of ineffective assistance of trial counsel. Thus, what is cognizable on this collateral attack is a layered claim of ineffective assistance of counsel, *i.e.,* a claim that trial counsel was ineffective in failing to anticipate *Besch,* argue that the evidence was insufficient to go forward on the Pa. C.O.A. charge, and then argue that any and all evidence admissible **only** because of those charges must be excluded, combined with a claim that appellate counsel was ineffective in failing to raise trial counsel's ineffectiveness in this regard on direct appeal. Such a layered claim is subject to the *Strickland/ Pierce* test as to each attorney, including its prejudice requirement—*i.e.,* appellee at this stage of the proceeding has the burden of showing that, if a *Besch* objection had been raised by counsel at the trial level, the evidence he now complains of would have been excluded as a matter of law, and there is a reasonable probability that the failure to exclude it essentially caused the verdicts for murder, robbery, and conspiracy. That showing, in turn, would establish the arguable merit of his claim respecting appellate counsel. *See Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014, 1022–23 (2003)

The first and fatal difficulty for appellee, of course, is that trial and appellate counsel are not identically situated when it comes to *Besch.* When appellee's case was charged and tried, prevailing case law in Pennsylvania was that the statute encompassed enterprises affecting both legitimate and wholly illegitimate enterprises. *See, e.g., Commonwealth v. Wetton,* 537 Pa. 100, 641 A.2d 574, 579 n. 5 (1994) (Opinion in Support of Reversal by Zappala, J., joined by Flaherty, J.) ("[W]e find that neither the preamble nor the express language of the statute prevents its proscription from reaching enterprises organized and existing for illegal purposes."); *Commonwealth v. Iannelli,* 430 Pa.Super. 402, 634 A.2d 1120,

1130 (1993), *alloc. denied,* 537 Pa. 659, 644 A.2d 1197 (1994) ("[A]n enterprise can be a wholly illegal entity."); *Commonwealth v. Donahue,* 428 Pa.Super. 259, 630 A.2d 1238, 1245 (1993), *alloc. denied,* 538 Pa. 612, 645 A.2d 1316 (1994) ("This Court has interpreted th[e] term [enterprise] to encompass both legitimate and illegitimate enterprises."). Moreover, the statute itself, by its plain language, did not exclude wholly illegitimate enterprises: to the contrary, the definition of enterprise spoke of "any" group of individuals associated in fact. The eventual interpretation embraced by the *Besch* majority opinion was premised upon the perceived overall legislative intent. That conclusion, however, was not foreshadowed by anything in Pennsylvania jurisprudence, and it was rendered over a three-Justice dissent which invoked the plain language of the statute. Trial counsel, of course, cannot be deemed ineffective for failing to predict a change or development in the law. *Gribble,* 863 A.2d at 464 ("Counsel cannot be deemed ineffective for failing to predict developments or changes in the law."). Given the plain language of the Pa.C.O.A. statute, and the prevailing case law at the time of trial—including the expressed plain language views, in *Wetton,* of two of the four Justices who later joined the *Besch* majority—trial counsel cannot be faulted for failing to articulate the argument that later prevailed in *Besch.* And, because trial counsel cannot be deemed ineffective, direct appeal counsel cannot be deemed ineffective for failing to claim that trial counsel should have anticipated *Besch. Commonwealth v. Edmiston,* 578 Pa. 284, 851 A.2d 883, 891 (2004) ("If the underlying (or 'nested,' to use the term employed in [*Commonwealth v. Rush,* 576 Pa. 3, 838 A.2d 651, 656 (2003)]) claim of trial counsel ineffectiveness fails the *Strickland/Pierce* test, then the derivative claim of appellate counsel ineffectiveness necessarily fails.") (citing *McGill,* 832 A.2d at 1023); *accord Commonwealth v. Reaves,* 592 Pa. 134, 923 A.2d 1119, 1132 n. 14 (2007) ("Because appellee's underlying claim of VOP counsel ineffectiveness fails, his 'layered' claim respecting VOP appeal counsel necessarily fails.").

Alternatively, even if trial counsel could be faulted, in hindsight, for failing to forward the argument that later prevailed in *Besch*, appellee has failed to prove prejudice-*i.e.*, he has failed to prove that the Pa.C.O.A. evidence which came in would both: (1) not otherwise have been admissible; and (2) caused him *Strickland/Pierce* prejudice.

The first category of evidence appellee claims should have been excluded is testimony from James White and James McArthur concerning uncharged "other crimes" where it was alleged that appellee was directly involved. Thus, appellee argues that the following testimony offered by his cooperating co-conspirator James White at trial was inadmissible other crimes evidence:

Q: Did you end up working for Christopher Williams?

A: Yes.

Q: What type of things did you do for Christopher Williams and with Christopher Williams?

A: Well, I would set up people up [sic]. I would set up drug dealers around my neighborhood and Christopher Williams would go and rob the drug dealers and take their money and divide it up among us that was [sic] involved in the robberies[,] and he would also give me packages of drugs to sell around my neighborhood, and he would come up and pick up the money and bring more drugs down for me to sell.

\* \* \*

Well, like I said, I was interested in sticking up drug dealers around my neighborhood, and I told Rick Bennett about my plan, that I wanted to stick up these drug dealers and I told him that I didn't have no [sic] gun.

He told me that he had a half brother by the name of Chris that was involved in drug sales, who had guns, and he was involved with stick ups and things like that, things that I wanted to do.

N.T., 7/26/93, at 12–13, 27; *see* Appellee's Brief at 16.

Q: Who else worked for Christopher Williams?

A: Theopolis Wilson, Binky; Rick Bennett, myself and a man by the name of Obie, Troy Coulston and other people living in the Germantown Archway. I really don't know by name.

*Id.* at 13, 674 A.2d 655; *see* Appellee's Brief at 16.

Q: [Upon robbing drug dealers, w]hat would be done with the drugs taken or what was supposed to be done with the drugs that were taken?

A: Well, if there were drugs taken from a robbery, drugs would be taken, sold back at the Archway and placed back in a certain area and make more money and they would buy guns and whatever else Christopher Williams might provide.

*Id.* at 15, 674 A.2d 655; *see* Appellee's Brief at 16.

Q: As far as procedure and your business, when you rob people, what happened to them?

A: When the people were robbed, most of the time they were killed, but when we would go and rob, our objective for the robbery was to get the money, and if we could get the money without harming the people, we would do that. But most of the time, the people were sho[t] and killed.

*Id.* at 17, 674 A.2d 655; *see* Appellee's Brief at 16.

Appellee maintains that the following testimony given by James McArthur, a cooperating co-conspirator in the William Graham murder, is inadmissible other crimes evidence:

Q: How did you come to get involved with Christopher Williams?

A: Through his half brother, Rick Bennett.

Q: Why Chris Williams?

A: Because Rick said his brother had guns, and we were going to go out and rob people, but we didn't have any guns. He said his brother Chris had some.

N.T., 7/27/93, at 128; *see* Appellee's Brief at 16.

The Commonwealth's primary argument as to all seven categories of Pa.C.O.A. evidence appellee raises is the same: appellee was not prejudicially affected by this evidence because the jury found appellee guilty of only three of the eight

predicate racketeering acts submitted to it with regard to the substantive Pa.C.O.A. charge. The three predicate acts that the jury found appellee committed were the three murders and robberies for which he was convicted, *i.e.*, the murder and robbery of Gavin Anderson, the murder and robbery of Kevin Anderson, and the murder and robbery of Otis Reynolds. *See supra* n. 12. Therefore, according to the Commonwealth, the admission of other crimes evidence cannot be deemed prejudicial where the jury expressly found appellee criminally responsible for only the murders and robberies in which he was the actual shooter, and, thus, the remaining Pa.C.O.A evidence had no impact on the verdict. We find that this argument has merit. By not finding appellee criminally responsible for the remaining five predicate acts, the jury obviously rejected the evidence submitted in support of those acts.

In addition, the evidence encompassed in the above testimony would have been admissible under Pa.R.E. 404(b)(2). This Court recently summarized the applicable law relevant to this issue as follows:

> Typically, all relevant evidence, *i.e.*, evidence which tends to make the existence or non-existence of a material fact more or less probable, is admissible, subject to the prejudice/probative value weighing which attends all decisions upon admissibility. *See* Pa.R.E. 401; Pa.R.E. 402; *see also Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767, 775 (2004).
>
> A long-accepted exception to this general rule of admissibility, which is reflected in Rule 404(b)(1) of the Pennsylvania Rules of Evidence, states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Character evidence (whether good or bad) is, of course, **relevant** in criminal prosecutions; that is why an accused has the right to introduce evidence of good character for relevant character traits. *See* Pa.R.E. 404(a)(1). Evidence of separate or unrelated "crimes, wrongs, or acts," however, has long been deemed inadmissible as character evidence against a criminal defendant in this Commonwealth as a matter not of relevance, but of policy, *i.e.*,

because of a fear that such evidence is so powerful that the jury might misuse the evidence and convict based solely upon criminal propensity. *See Commonwealth v. Ulatoski,* 472 Pa. 53, 371 A.2d 186, 191 n. 11 (1977). Because the fear against which this exception to the general rule of relevance/admissibility is aimed concerns use of prior crimes to show bad character/propensity, a series of "exceptions to the exception" (to the rule of relevance) have been recognized. Thus, as Rule 404(b)(2) reflects, evidence of "other crimes, wrongs, or acts" may be admitted when relevant for a purpose other than criminal character/propensity, including: proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. *See, e.g., Commonwealth v. Chmiel,* 585 Pa. 547, 889 A.2d 501, 534 (2005); *Malloy,* 856 A.2d at 775. This list is not exhaustive. Pa. R.E. 404(b) cmt. For instance, this Court has recognized a *res gestae* exception to Rule 404(b) which allows admission of other crimes evidence when relevant to furnish the context or complete story of the events surrounding a crime. *Commonwealth v. Williams,* 586 Pa. 553, 896 A.2d 523, 539 (2006); *Commonwealth v. Paddy,* 569 Pa. 47, 800 A.2d 294, 307–08 (2002); *see also Commonwealth v. Lark,* 518 Pa. 290, 543 A.2d 491, 497 (1988) (evidence of other crimes may be relevant and admissible to show "part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts").

*Commonwealth v. Dillon,* 592 Pa. 351, 925 A.2d 131, 136–37 (2007).

It is crucial to recognize that, even if the "criminal enterprise" conduct here could not support a Pa.C.O.A. charge under *Besch,* appellee still was properly charged with, and convicted of, criminal conspiracy. The crime of corrupt organizations targets criminal confederations; thus, it is but a subspecies of conspiracy. And, of course, the Commonwealth was entitled to show the full scope and extent of the conspiracy charged, so that the individual crimes would not be presented in a vacuum, lacking context.

The evidence admitted at trial surrounding the murders of the Anderson brothers and Otis Reynolds, primarily through the testimony of James White, revealed that the victims were drug dealers from New York who were lured to an apartment complex in the Germantown section of Philadelphia under the pretext of appellee selling guns to them. James White further testified that, once the victims were inside of the apartment, appellee and his fellow conspirators forced them to the ground at gunpoint, bound their ankles and wrists, robbed them, removed them from the apartment and into a van, drove around the city, killed each one in the van, and then dumped their bodies in a park. The "other crimes" evidence reflected in James White's and James McArthur's testimony described above is relevant to show appellee's intent to conspire to rob drug dealers at gunpoint and kill them if necessary. Notably, James White's testimony regarding robbing drug dealers at gunpoint and occasionally killing them encompassed the very same crimes that appellee was charged with, and convicted of, by the jury.

It is true, of course, that appellee's failure to anticipate and raise a contemporaneous *Besch*-type objection at trial deprived the trial court of an opportunity to engage in the probative value/prejudice weighing that would have been required. But, contrary to appellee's belief, this does not mean that he prevails, for he still has to overcome the *Strickland* burden. The probative value of the Pa.C. O.A./conspiracy/intent/complete-the-story evidence was strong, given the identical nature of the crimes compared to the manner and circumstances surrounding the murders and robbing of the Anderson brothers and Otis Reynolds. Moreover, even in the absence of objection, the trial court undertook precautionary measures by issuing a "corrupt and polluted sources" charge to the jury concerning the testimony offered by White and McArthur due to their roles as accomplices in the crimes, and a cautionary instruction regarding White's sentencing recommendation agreement with the Commonwealth. N.T., 8/4/93, at 51–55. On this record, appellee has not proved prejudice.

The second category of evidence appellee claims should have been excluded concerns testimony by James White and co-

defendant Bennett about the attempted robbery of David Perez, a drug dealer, that resulted in the murder of Marron Jenrette. Appellee does not quote specific testimony for this category; rather, he summarizes the testimony as follows:

> James White testified that a friend of his named Terrence Smith approached him about setting up a drug dealer named David Perez. To facilitate the robbery, James White put Terrence Smith in touch with "someone" who could set it up. Then, together with co-defendant Rick Bennett and "someone," they all planned the robbery. According to White, while attempting to rob David Perez's home, Troy Coulston, who was also involved in the robbery, shot and killed Marron Jenrette.

Appellee's Brief at 17 (citing N.T., 7/26/93, at 18–26). Appellee claims that the "someone" referred to in the testimony was appellee, albeit he concedes that his name was not explicitly identified by James White and was redacted in co-defendant Bennett's statement to police, which was admitted at trial. Nevertheless, appellee maintains that it was clear to the jury that the unidentified "someone" was appellee. Appellee then argues that this evidence was inadmissible because: he was previously acquitted of any involvement in the attempted robbery of David Perez and resulting Marron Jenrette murder; and, these crimes were not alleged as predicate racketeering acts against him.

The Commonwealth responds that the evidence concerning the Perez robbery and Jenrette murder was not introduced against appellee—it was admitted against co-defendant Bennett as one of the predicate racketeering acts in support of his substantive Pa.C.O.A. charge. Therefore, according to the Commonwealth, this evidence was admissible for an independent ground unrelated to appellee's Pa.C.O.A. charges. We agree. This evidence was admitted for the purpose of proving co-defendant Bennett's substantive Pa.C.O.A. charge as one of his predicate racketeering acts.[20] Moreover, the trial court

20. The eight predicate racketeering acts submitted to the jury for the substantive Pa.C.O.A. charge for co-defendant Bennett were the following:

properly instructed the jury that evidence could only be considered against the defendant for which it was introduced, and not against the other co-defendants. The limiting instruction offered by the trial court to the jury was as follows:

[T]here were times during the trial when certain evidence was admitted that only involved one or possibly two defendants, and not all the defendants.

I am not going to go through that in detail now, but that evidence can be considered only against that particular defendant.

So, in effect, you have to consider each defendant being tried separately, but all of them were tried together in one trial.

Obviously a lot of the evidence referred to the incidents in question as to all three defendants, so it would be pointless to have three separate trials.

But keep in mind if there was any evidence mentioned which only referred to one defendant, then that evidence can only be considered against that defendant, not against the others.

Some of the evidence referred to all three defendants; some of it to just to two of them.

N.T., 8/4/93, at 42–43. Therefore, we must presume that the jury followed the trial court's charge and did not consider this evidence against appellee. *Commonwealth v. McCrae*, 574 Pa. 594, 832 A.2d 1026, 1034 (2003), *cert. denied*, 543 U.S. 822, 125 S.Ct. 31, 160 L.Ed.2d 32 (2004) ("It is an 'almost invariable assumption of the law that jurors follow their instructions.'")

(1) the murder of William Graham on February 18, 1989;
(2) the murder and robbery of Gavin Anderson on September 25, 1989;
(3) the murder and robbery of Kevin Anderson on September 25, 1989;
(4) the murder and robbery of Otis Reynolds on September 25, 1989;
(5) the conspiracy to commit any or all of the above acts;
(6) the conspiracy to rob a drug dealer "Troy" in early 1989;
(7) the conspiracy to rob a drug dealer "Sweetest" in early 1989;
(8) the conspiracy to rob a drug dealer David Perez on June 24, 1989.
N.T., 8/4/93, at 119.

(quoting *Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987)); *see also Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859, 883 (2000), *cert. denied,* 535 U.S. 1102, 122 S.Ct. 2306, 152 L.Ed.2d 1061 (2002) (same). Accordingly, appellee has not proved *Strickland/Pierce* prejudice.

The third category of evidence appellee argues should have been excluded is testimony from James White and Dr. Ian Hood about the robbery and murder of a drug dealer named Michael Haynesworth. Regarding James White, appellee summarizes his testimony on this category as follows:

> White testified that Rasheeda Salaam lured Michael Haynesworth to her home on orders of Appellee. When Haynesworth arrived, White, Appellee and Troy Coulston attacked him; held him at gun-point; bound and blindfolded him; and beat him over a period of hours. After stealing his shoes, the three drove Haynesworth to Fairmount Park where, after first promising to release him, they subsequently shot him in the head with a shot-gun, purportedly on Appellee's orders.

Appellee's Brief at 19 (citing N.T., 7/26/93, at 68–80).

> White identified Commonwealth exhibit C–20—a nine millimeter handgun—that bore no connection to the crimes for which Mr. Williams was on trial—as being the gun Appellee purportedly used to restrain Michael Haynesworth.

*Id.* (citing N.T., 7/26/93, at 71).

> White testified that Mr. Williams purportedly threatened to kill him and his family because he (White) had told someone named Hakeem Williams about the Michael Haynesworth murder.

*Id.* (citing N.T., 7/26/93, at 82–83).

Concerning Dr. Hood's testimony about his autopsy of Michael Haynesworth's body, appellee summarizes his testimony as follows:

> His hands, wrists, and ankles were still bound with telephone cord, and Haynesworth was still blindfolded with the necktie. Hood described details of the appearance of the

gunshot wounds on Haynesworth's cheek and nose, and the resulting destruction of Haynesworth's face; discussed various items lodged inside Haynesworth's head; additional shotgun wounds on Haynesworth body, including a wound on his left groin and three grazing wounds. Dr. Hood gave graphic descriptions of the destruction of the face, splitting of the neck, and damage to the bone structure underneath the face.

*Id.* (citing N.T., 7/29/93, at 18–22).

Appellee's claim concerning this category of evidence suffers from the same deficiencies as his claim respecting the first category of evidence. The evidence was relevant to show appellee's intent to conspire to rob drug dealers at gunpoint and kill them if necessary. The manner in which appellee robbed and killed Michael Haynesworth was the same brutal manner that he employed in robbing and killing the Anderson brothers and Otis Reynolds. Therefore, the probative value of the Pa.C. O.A./conspiracy/intent/complete-the-story evidence was strong given the virtually identical nature of this murder compared to the manner and circumstances surrounding the murders and robbing of the Anderson brothers and Otis Reynolds. Moreover, the jury received a "corrupt and polluted source" instruction from the trial court regarding James White's testimony, as well as a cautionary instruction regarding White's sentencing recommendation agreement with the Commonwealth. N.T., 8/4/93, at 51–55. Therefore, on this record, appellee has not proved prejudice.

The fourth category of evidence appellee claims should have been excluded is further testimony offered by James White and James McArthur about the attempted robbery of two drug dealers known as "Troy" and "Sweetest." Appellee maintains that he was never charged or arrested for these crimes. Appellee summarizes their testimony as follows:

White testified that Appellee wanted him, Rick Bennett and James McArthur to rob a drug dealer named Troy who had a kilo of cocaine, money and other valuables in his house. According to White, Appellee distributed guns and drove the three to the Logan section of Philadelphia where Troy

lived. However, after Mr. Williams paged Troy to lure him to the robbery, but before the robbery could take place, the police arrived in the area and they had to abandon their weapons and plans to rob Troy.

Appellee's Brief at 20 (citing N.T., 7/26/93, at 84–86).

James McArthur also testified about this attempted robbery of Troy in the Logan section of Philadelphia.

*Id.* (citing N.T., 7/27/93, at 132–33, 177–79).

James McArthur testified that Appellee and Rick Bennett purportedly solicited his help in robbing "Sweetest." He stated that Appellee had a gun and all three of them waited for "Sweetest," who never showed up. After the failed attempt, Mr. Williams threatened to kill him if he told anyone what happened.

*Id.* (citing N.T., 7/27/93, at 128–31, 166, 175–77).

In addition to being introduced against appellee as two of his predicate racketeering acts, as correctly argued by the Commonwealth, evidence concerning co-conspirators' attempted robberies of "Troy" and "Sweetest" was also introduced against co-defendant Bennett as two of the predicate racketeering acts in support of his substantive Pa.C.O.A. charge. *See supra* n. 20. Therefore, similar to the second category of evidence, this evidence was admissible for an independent ground unrelated to appellee's Pa.C.O.A. charges.

Additionally, this evidence suffers similar deficiencies as the first and third categories of evidence because the "other crimes" evidence reflected in James White's and James McArthur's testimony is relevant to show appellee's intent to conspire with his cohorts to rob drug dealers at gunpoint. The manner of the planning and scheme concocted by appellee for robbing "Troy" and "Sweetest" is consistent with the plan carried out by appellee in the robbing and killing of the three victims in the case *sub judice.* Moreover, the trial court issued a "corrupt and polluted source" charge to the jury instruction regarding the testimony offered by White and McArthur, as well as a cautionary instruction regarding White's sentencing recommendation agreement with the Com-

monwealth. N.T., 8/4/93, at 51–55. Consequently, appellee again has not proved prejudice.

The fifth category of evidence concerns testimony by David Lee about illegal gun purchases and other weapons paraphernalia made by appellee and co-defendant Wilson from 1988–1990. Appellee summarizes this evidence as follows:

> David Lee's testimony that he purchased two guns for Appellee in 1988, a .45 caliber handgun and a Tech Nine machine gun. David Lee testified that he purchased a nine millimeter Tech Nine for Theopolis Wilson in 1990. David Lee testified that he purchased two more nine millimeter handguns for Theopolis Wilson in 1990.

Appellee's Brief at 21 (citing N.T., 7/27/93, at 59, 61).

The portion of David Lee's testimony concerning "other crimes" evidence, namely, appellee's purchase of two illegal handguns, suffers similar deficiencies as the first and third categories of evidence because this evidence was relevant to complete the story of how appellee obtained the weapons which he himself used to rob, and occasionally kill, other drug dealers. The probative value of this evidence was strong because appellee's illegal handguns were an intricate tool in his organization's conspiracy to rob drug dealers at gunpoint. As for the portion of Lee's testimony concerning gun purchases made for Wilson, any additional prejudicial effect of this testimony was minor in light of the above properly admitted evidence that Lee had purchased guns for appellee himself. There is not a reasonable probability that the trial court's failure to exclude this portion of Lee's testimony essentially caused appellee's murder, robbery, or conspiracy convictions. Accordingly, appellee has not proved prejudice.

The penultimate category of evidence appellee argues should have been excluded is surveillance tapes and testimony from ATF Agent Daniel Machonis regarding attempted purchases of guns, drugs, and bulletproof vests by co-defendant Wilson on behalf of appellee's organization. Again, similar to the second and a portion of the previous category of evidence, all of the evidence presented in this sixth category was

admitted against co-defendant Wilson as one of the predicate racketeering acts in support of his substantive Pa.C.O.A. charge, and not against appellee.[21] Therefore, this evidence was admissible for an independent ground unrelated to appellee's Pa.C.O.A. charges. Moreover, because the trial court issued a limiting instruction as to this evidence, it must be presumed that the jury did not consider any of this evidence against appellee. *McCrae*, 832 A.2d at 1034; *Bridges*, 757 A.2d at 883. Therefore, appellee has not proved prejudice.

The seventh and final category of evidence appellee claims should have been excluded concerns references made by the prosecutor in his closing argument to portions of the evidence contained in the previous six categories. Given our decision that all of the evidence encompassed in the prior six categories was admissible against appellee for reasons independent of the corrupt organization charges and in support of appellee's co-defendants' substantive Pa.C.O.A. charges, or is relevant "other crimes" evidence under Pa.R.E. 404(b)(2), all references to this evidence by the prosecutor described above were proper. Accordingly, appellee has failed to prove prejudice.

■■■ We now turn our attention to appellee's cross-appeal of the PCRA court's dismissal of his remaining PCRA claims in its May 14, 2002 order. Most of the claims raised by appellee are reviewable only as layered ineffective assistance of counsel claims. The PCRA court, however, failed to address those claims sounding in layered ineffectiveness. The court lacked the benefit of this Court's decision in *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003), where we delineated the specific construct necessary for a petitioner to "plead, present, and prove" the ineffectiveness of appellate

---

**21.** The five predicate racketeering acts submitted to the jury for the substantive Pa.C.O.A. charge for co-defendant Wilson were the following:

(1) the murder and robbery of Gavin Anderson on September 25, 1989;
(2) the murder and robbery of Kevin Anderson on September 25, 1989;
(3) the murder and robbery of Otis Reynolds on September 25, 1989;
(4) the conspiracy to commit any or all of the above acts;
(5) the conspiracy to trade narcotics for firearms from August to October of 1990.

N.T., 8/4/93, at 118–19.

counsel, where layered claims are involved. In *McGill*, we acknowledged that this Court had not been entirely clear concerning what a PCRA petitioner must do in order to plead and prove a layered ineffectiveness claim. Regarding such instances, we held that "a remand to the PCRA court may be appropriate for cases currently pending in the appellate courts where the petitioner has failed to preserve, by pleading and/or presenting, a layered ineffectiveness claim in a manner sufficient to warrant merits review." *Id.* at 1024. This holding was primarily based upon Pennsylvania Rule of Criminal Procedure 905,[22] which we noted "indicates the desire of this Court to provide PCRA petitioners with a legitimate opportunity to present their claims to the PCRA court in a manner sufficient to avoid dismissal due to a correctable defect in claim pleading or presentation." *Id.*

Given the PCRA court's disposition of the above issue, the PCRA court's discussion addressing appellee's twenty-five claims cites a paucity of applicable statutory and case law, and engages in little substantive discussion of the claims. Consistent with previous decisions of this Court, we will vacate the PCRA court's May 14, 2002 order dismissing appellee's collateral claims and remand the matter to the PCRA court for appellee to properly plead his layered ineffective assistance of counsel claims consistent with the construction set forth in *McGill*. *See Commonwealth v. Thomas*, 578 Pa. 455, 854 A.2d 411 (2004) (*per curiam*); *Commonwealth v. Smith*, 577 Pa. 251, 844 A.2d 549 (2004) (*per curiam*); *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 738–39 (2000) (remanding matter to PCRA court for issuance of factual findings and

---

**22.** Rule 905 provides, in relevant part, the following:

(A) The judge may grant leave to amend or withdraw a petition for post-conviction collateral relief at any time. Amendment shall be freely allowed to achieve substantial justice.

(B) When a petition for post-conviction collateral relief is defective as originally filed, the judge shall order amendment of the petition, indicate the nature of the defects, and specify the time within which an amended petition shall be filed. If the order directing amendment is not complied with, the petition may be dismissed without a hearing.

Pa.R.Crim.P. 905(A)-(B).

revised conclusions of law). The lower court's truncated analysis of appellee's claims in its opinion prevents this Court from conducting meaningful appellate review. Therefore, the PCRA court is instructed to conduct a more thorough and exacting review and discussion of the entirety of appellee's claims on remand.

In conclusion, for the foregoing reasons, we affirm the PCRA court's May 29, 2003 order to the extent that it vacated appellee's Pa.C.O.A. conviction; we reverse the PCRA court's May 29, 2003 order to the extent that it granted appellee a new trial; we vacate the portion of the PCRA court's May 14, 2002 order dismissing appellee's other claims; and we remand the matter to the PCRA court for consideration of appellee's cross-claims. Jurisdiction relinquished.

Chief Justice CAPPY and Justice SAYLOR join the opinion.

Justice FITZGERALD files a concurring opinion in which Justice BAER joins.

Justice BALDWIN concurs in the result.

Justice EAKIN files a concurring and dissenting opinion.

Justice FITZGERALD, concurring.

I join fully in the majority's analysis and conclusion affirming the PCRA court's order vacating appellee's Pa.C.O.A. conviction, and remanding to the PCRA court for consideration of most of his collateral claims pursuant to our decision in *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003). I also join in the majority's conclusion that trial and direct appeal counsel were not ineffective for failing to raise *Besch*-related claims, and in the majority's subsequent finding that the admission of the evidence challenged by appellee "cannot be deemed prejudicial where the jury expressly found appellee criminally responsible for only the murders and robberies in which he was the actual shooter." M.O. at 396, 936 A.2d at 30. As the majority notes, "the jury obviously rejected the evidence submitted in support of [the five unfounded predicate] acts." *Id.* As a result of the jury's acquit-

ting appellee of crimes in which he was not the shooter, I agree that appellee was not prejudiced by the admission of evidence unrelated to the murders of Gavin Anderson, Kevin Anderson, and Otis Reynolds. Because I believe that this would be a sufficient basis upon which to find a lack of *Strickland/Pierce* prejudice, I see no need to address the specific admissibility of each piece of evidence challenged by appellee. Accordingly, I decline to join that portion of the majority opinion.

Justice BAER joins this concurring opinion.

Justice EAKIN, concurring and dissenting.

I respectfully dissent from the majority's affirmance of the PCRA court's conclusion that this Court would have reversed appellee's PaCOA conviction on direct appeal, had appellate counsel raised *Commonwealth v. Besch*, 544 Pa. 1, 674 A.2d 655 (1996) (PaCOA not applicable to wholly illegitimate organizations).

Trial counsel could not be found ineffective for failing to anticipate *Besch*, which was not decided at the time of trial. At the time of trial, the PaCOA had been held to apply to both legitimate and illegitimate enterprises. *See Commonwealth v. Yacoubian*, 339 Pa.Super. 413, 489 A.2d 228 (1985). Thus, trial counsel cannot be deemed ineffective, and any layered claim of appellate counsel's ineffectiveness premised on this underlying claim necessarily fails.

The ineffectiveness inquiry here is whether appellate counsel was ineffective for failing to argue, on direct appeal, that *Besch* should apply retroactively, rendering appellee's PaCOA conviction a nullity. The relevant period for assessing appellate counsel's stewardship is during appellee's direct appeal. *See Commonwealth v. Bond*, 572 Pa. 588, 819 A.2d 33, 51 (2002) (fair assessment of attorney performance requires evaluation of conduct from counsel's perspective at time).

At the time appellate counsel filed his appellate brief in this case, the legislature had amended the PaCOA in immediate

response to *Besch*,[1] making clear that the statute encompassed both legitimate and illegitimate organizations; *Commonwealth v. Shaffer*, 557 Pa. 453, 734 A.2d 840 (1999) (holding *Besch* applies retroactively to date of PaCOA's enactment) had not been decided. Appellate counsel should not be deemed ineffective for failing to anticipate the holding in *Shaffer*. Therefore, I cannot agree with the majority's conclusion that appellate counsel was *per se* ineffective for failing to challenge appellee's PaCOA conviction when the law at the time of trial and direct appeal supported the conviction.

Accordingly, I would reverse the order of the PCRA court vacating appellee's PaCOA conviction; in all other respects, I join the majority's disposition.

---

1. *Besch* was decided April 17, 1996, and the PaCOA was amended June 19, 1996, effective immediately. I am of the view that *Besch*, although now of limited applicability since the 1996 amendments, incorrectly interpreted the prior version of § 911(h)(3) of the PaCOA in the first place. Appellate counsel filed his brief March 31, 1997; *Shaffer* was not decided until 1999.